INVESTORS CAPITAL
CORPORATION,
Plaintiff,

v.

Gerald H. BROWN, Helen M.
Brown, Defendants.

Investors Capital Corporation,
Plaintiff,

Cecil T. Bragg, Elizabeth M.
Bragg, Defendants.

Nos. 6:00CV595ORL31JGG,
6:00CV598ORL31JGG.

United States District Court,
M.D. Florida,
Orlando Division.

May 21, 2001.

Burton Webb Wiand, Fowler White Gillen Boggs Villareal et al., Clearwater, FL, for Plaintiff.

Joel A. Goodman, Stephen Craig Krosschell, Goodman & Nekvasil PA, Clearwater, Fl, for Defendants.

## MEMORANDUM OPINION

PRESNELL, District Judge.

This cause came on for consideration after an evidentiary hearing on the Defendants' motions to compel arbitration and stay these actions, the Report and Recommendation of the Magistrate Judge as to those motions, and the various objections to that report and recommendation.

*Background*

The Defendants in these consolidated cases—Gerald and Helen Brown in Case No. 6:00–cv–595–Orl–JGG ("the '595 case") and Cecil and Elizabeth Bragg in Case No. 6:00–cv–598–Orl–JGG ("the '598 case")— purchased securities known as First American Capital Trust Certificate of Commercial Notes ("FACT notes") through Virgil A. Smith and Angela Staub. In both cases, the Defendants made their initial FACT note purchases prior to the time that Smith and Staub became associated with the Plaintiff in these cases, Investors Capital Corporation ("ICC") [1]; also in both cases, the Defendants repurchased [2] the FACT notes after Smith and Staub became associated with ICC. ICC is a member of the National Association of Securities Dealers ("NASD"). The FACT notes turned out to be a bad investment, and the Defendants now seek to recover damages from Smith, Staub, and ICC, among others. To that end, the Defendants filed arbitration claims with the NASD in March of 2000.

On May 12, 2000, ICC filed separate complaints in this Court against the Browns and the Braggs to enjoin the arbitration proceedings on the grounds that the Defendants were not "customers"— and therefore did not have a right to compel arbitration—under the NASD rules. The Browns and Braggs responded by filing a motion to compel arbitration. The cases were subsequently consolidated.

On October 27, 2000, after a hearing, Magistrate Judge Glazebrook entered a Report and Recommendation on the Defendants' motions to compel arbitration

---

1. The Braggs purchased one new FACT note in February of 1998, one month after Smith had become affiliated with ICC, but it appears from the record that Staub handled that transaction, rather than Smith. *See* Cecil Bragg Deposition Transcript, Exh. D to Doc. 75 in '595 case.

2. The parties variously characterize these latter transactions, which essentially involve repurchasing the (nine-month) FACT notes that had been purchased earlier, as "sales" (according to the Defendants) and "rollovers" (according to the Plaintiffs). For ease of reference, this Court will refer to the latter transactions as "repurchases".

and stay these proceedings. In essence, Judge Glazebrook concluded that

1. The Court, not the arbitrator(s), should decide whether these disputes were subject to arbitration;

2. The NASD rules conferred an enforceable third-party beneficiary right on "customers" to compel arbitration; and

3. The Browns and the Braggs were "customers" under those rules and therefore could compel arbitration of these disputes.

Based on these conclusions, Judge Glazebrook recommended that this Court should compel arbitration of these disputes and should dismiss these cases without prejudice. ICC objected to the former recommendation, initially on the grounds that it had not been allowed to conduct discovery, and subsequently, on the grounds that the Defendants were not "customers" able to compel arbitration; the Defendants objected to Judge Glazebrook's recommendation to grant a dismissal rather than a stay. *Legal Standards*

Arbitrability disputes connected with a transaction involving interstate commerce are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). *See* 9 U.S.C. § 2. No party disputes that the transactions at issue here involved interstate commerce.

 "In enacting [the FAA], Congress declared a strong national policy favoring arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). "The [FAA] establishes that, as a matter of [F]ederal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Notwithstanding this policy favoring arbitration, "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Information Sciences v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989). As the Supreme Court has stated: "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration [in] any dispute which he has not agreed so to submit." *AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986).

Section 4 of the FAA provides a federal remedy to a party seeking to compel compliance with an arbitration agreement:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

In the instant cases, the parties did not reach any agreement between themselves as to arbitration. Instead, any such "arbitration agreement" results from ICC's membership in the NASD and its obligation to abide by the NASD Code of Arbitration Procedure. NASD Rule 10301(a) provides that

[a]ny dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement *or upon the demand of the customer.* [Emphasis added.]

NASD rule 10101 provides that the following disputes are eligible for arbitration:

any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member ...

■ As Judge Glazebrook noted in the Report and Recommendation, "In the context of NASD arbitration, the issue of whether a would-be arbitration claimant is a 'customer' entitled to invoke NASD Rule 10301 is a threshold question going to the existence of an agreement to arbitrate, and not to the agreement's scope." Report and Recommendation at 10 (citing *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 820–21 (11th Cir.1993)). As such, it would be improper to apply the federal presumption in favor of arbitration when determining whether the Plaintiff agreed to arbitrate with these Defendants. The cases cited by the Defendants for a broader application of the presumption—for example, *Armijo v. Prudential Ins. Co. of America*, 72 F.3d 793 (10th Cir.1995)—address questions of whether a particular issue (such as the employment discrimination claims in *Armijo*) is arbitrable rather than the threshold issue of whether any agreement to arbitrate exists. The pre-

sumption arises *after* the court determines that the parties reached some agreement to arbitrate. *See, e.g., Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir.1998) ("[O]nce it is clear that the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration.") *and see Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941, 74 L.Ed.2d 765 (1983) ("[A]ny doubts concerning *the scope of arbitrable issues* should be resolved in favor of arbitration" [emphasis added] ). Until it is determined that an agreement to arbitrate was reached, the court must keep its thumb off the scales.

■ Finally, the Court agrees with Judge Glazebrook's conclusion that the motion to compel arbitration should be addressed under a summary judgment standard, and that is the standard this Court will employ in addressing the "customer" issue. *See, e.g., Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir.1995) (stating that "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried" and referencing Fed.R.Civ.P. 56).

*Analysis*

In the instant case, no party has taken issue with the Magistrate Judge's conclusions that the court, rather than the arbitrators, was required to determine whether these disputes were arbitrable, and that NASD Rule 10301 confers an enforceable, third-party beneficiary right in an NASD member's customers to compel arbitra-

tion[3]. This Court agrees with the Report and Recommendation as to these points, leaving for determination only the issue of whether *these* defendants were "customers" as that term is used in NASD Rule 10301.

The NASD Code of Arbitration Procedure provides little guidance on the "customer" issue. The applicable definition, found in NASD Rule 0120(g), provides only that "[t]he term 'customer' shall not include a broker or dealer." In construing the rule, courts have determined that the term is in some ways more broad, and in some ways more narrow, than the traditional, common-sense understanding of the term.

In *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814 (11th Cir.1993), the Eleventh Circuit Court of Appeals determined that even parties who were doing business directly with an NASD member might not qualify as customers under the NASD rules. The Defendants in that case had been customers of a securities firm (Marshall Securities) whose assets were later purchased by NASD member Wheat, First. *Id.* at 815–16. Based on a theory of successor liability, the customers filed arbitration claims against Wheat, First to recover for allegedly fraudulent acts committed by Marshall Securities and one of its agents. *Id.* Some of the defendants had transferred their accounts to Wheat, First after the alleged fraud, and thus, under common understanding, were undeniably "customers" of Wheat, First at the time they filed the arbitration claims. *Id.* at 816. The Eleventh Circuit, however,

held that a claimants' status as a customer must be determined as of the time the allegedly wrongful acts are committed, rather than at the time of filing:

> We believe that the rule preferred by Appellants would do significant injustice to the reasonable expectations of NASD members. We cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer.

*Id.* at 820.

The Court concludes that the *Wheat, First* holding also requires rejection of the expansive interpretation made by some courts that because Rule 0120(g) excludes only brokers and dealers from its definition, anyone not a broker or a dealer must be a customer. The *Wheat, First* defendants were neither brokers nor dealers, but the court held that they were nonetheless not customers for purposes of Rule 10301.

On the other hand, the Second Circuit Court of Appeals has held that actually doing business with an NASD member is not a prerequisite to becoming a customer of that member for purposes of the NASD Rules. In *Oppenheimer & Co., Inc. v. Neidhardt,* 56 F.3d 352 (2d Cir.1995), an Oppenheimer vice president, Stephen DeSimone, had solicited funds from someone who wanted to be an Oppenheimer customer, as well as that person's trustee. *Id.* at 357. The vice president then opened an

---

**3.** This latter issue was left unaddressed by the Eleventh Circuit Court of Appeals in *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814, 820 (11th Cir.1993), but various federal courts that have subsequently considered the question have concluded that the Rule does confer such a right upon "customers". *See, e.g., Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts Partnership,* 41 F.3d 861, 863–64 (2d Cir.1994).

Oppenheimer account with those funds, but placed them in the name of Euro–American Funding, Inc. ("EAF"), an entity having no relation to the investor. *Id.* After the money disappeared, the investor and the trustee brought arbitration claims against Oppenheimer. *Id.* at 354. Oppenheimer argued that the claimants had no right to compel arbitration because Oppenheimer never agreed to establish a customer relationship with them; instead, Oppenheimer contended, the investor and his trustee were strangers rather than customers. *Id.* at 357. The Second Circuit found two major flaws in this argument:

> First, [the argument] treats Oppenheimer's Vice President DeSimone as if he were a stranger, rather than one for whose acts Oppenheimer is responsible. In contending that Oppenheimer opened an account only for EAF and never dealt with the Claimants, Oppenheimer overlooks the critical fact that when Claimants dealt with DeSimone, they were dealing with Oppenheimer; DeSimone's acts were those of Oppenheimer. Second, Oppenheimer's diversion of the Claimants' funds into an account that did not reflect their status as customers was the very fraud of which they complain. Having turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to conceal and defeat their interest.

*Id.*

The *Oppenheimer* court also suggested that the outcome might have been differ-

ent if Oppenheimer had presented evidence that the Claimants, rather than DeSimone, had intended to establish the Oppenheimer account so as to conceal the Claimants' interest in the funds. *Id.* at 357–58. Because DeSimone was undisputedly an "associated person" of an NASD member,[4] and because the claimants were undisputedly customers of DeSimone, this dicta at least suggests that being a customer of an associated person is not, in itself, a sufficient basis for compelling arbitration with a member.

The Defendants suggest that the reasoning in *WMA Securities, Inc. v. Ruppert,* 80 F.Supp.2d 786 (S.D.Ohio, 1999) requires arbitration in this case, and, indeed, some other district courts seem to have reached that same conclusion. This Court, however, finds that case to be distinguishable. In *Ruppert,* similar to the instant case, the Defendants alleged that they had invested in certain promissory notes on the basis of misrepresentations made by registered representatives of WMA. *Id.* at 786. The *Ruppert* court first rejected WMA's argument that, because one Defendant never opened an account with WMA, she was not a WMA customer: "Plaintiff's narrow definition of the term 'customer' in Rule 10301(a) finds no support in the judicial decisions applying that rule. A broader interpretation, encompassing persons who had *informal business relationships* with NASD members, is well-supported in the case law and the NASD Rules." *Id.* at 789 (emphasis added). The *Ruppert* court concluded that "[b]y conducting business with [WMA]'s registered representatives, the Defendants conducted business with

---

4. As earlier noted, DeSimone was an Oppenheimer Vice President. Although the NASD Code of Arbitration Procedure does not contain a definition for "associated person", the NASD by-laws define an associated person as including "a sole proprietor, partner, officer, director, or branch manager of a member." NASD By–Laws, Art. I, (ee).

[WMA] and became its customers." *Id.*[5]

■ Before reaching that conclusion, however, the court pointed out that "[t]he evidence unequivocally establishes that both Defendants knew that their investment advisors were associated with Plaintiff at the time of the alleged misrepresentations that give rise to the Defendants' arbitration claims." *Id.* The evidence is not so unequivocal in the instant case, as detailed below, and even if the *Ruppert* case was controlling authority, rather than persuasive, this Court would conclude that the different facts of this case militate against summary judgment in favor of arbitration.

■ After considering the cases cited above, and the remaining cases cited by the parties in their various memoranda, the Court concludes that in joining the NASD, ICC agreed to arbitrate disputes with *its* customers, rather than the customers of every person associated with ICC. The opposite construction of Rule 10301, the Court concludes, would "do significant injustice to the reasonable expectations of NASD members." *Wheat, First*, 993 F.2d at 820. To compel arbitration as "customers", the Defendants must establish that they were ICC customers at the time of the transactions giving rise to their arbitration claims. *Id.* Because they did not have ICC accounts or other evidence of a traditional customer relationship with ICC, the Defendants must show that they established an informal business relationship with ICC, *Ruppert*, 80 F.Supp.2d at 789, or at least attempted to do so, *Oppenheimer*, 56 F.3d at 357.

The record is bare of any objective evidence that the Defendants established such an informal relationship—e.g., correspondence to or from ICC. As to any attempt to form such a relationship, the Defendants have testified at deposition that Smith and Staub (1) informed them of their new affiliation with ICC, (2) praised ICC for its stability and oversight, and (3) assured the Defendants that ICC backed the FACT Note investments.[6] As a result, the Defendants further testified that they relied upon ICC's relationship with Smith and Staub in reaching their decision to repurchase the FACT Notes.

The Court finds that these assertions, if true, would establish that the Defendants intended to create the sort of informal business relationship with ICC that would allow them to qualify as Rule 10301 "customers" at the time of the FACT Note repurchases. However, in their affidavits, Smith and Staub dispute the Defendants' version of the events surrounding those transactions. *See, e.g.*, Affidavit of Angela Staub, Doc. 24 in '595 (denying that she ever represented to the Browns that the FACT purchases had anything to do with Investors Capital). In addition, the Court finds internal inconsistencies in the Defendants' depositions.

For example, Cecil Bragg testified that he and his wife purchased and repurchased several FACT notes without knowing

---

**5.** As in the *Oppenheimer* case, the *Ruppert* court's conclusion suggests that simply doing business with persons associated with a member is not sufficient to compel arbitration with the member. It was undisputed that the *Ruppert* defendants had done business with persons associated with WMA. If being a customer of an associated person was sufficient, the

*Ruppert* court had no need to decide whether the Defendants were customers of WMA.

**6.** One Defendant in the '595 case, Helen Brown, was unable to recall specifics about the FACT note transactions during her deposition.

about (or relying upon) Smith's affiliation with ICC (Doc. 75, Exh. D in '595 case at page 44–48). In response to leading questions from his attorney, however, Mr. Bragg testified that he *did* rely upon the ICC affiliation in making later FACT note repurchases (*id.* at 53–54). In addition, although the Braggs had been doing business with Smith since the late 1980s, *id.* at page 9, Mr. Bragg recalled nothing about any previous affiliations that Smith had, *id.* at page 26, 28, 32–34.[7]

Similarly, Gerald Brown testified that it was "important" to him that Smith was affiliated with ICC when he made the decision to repurchase the FACT notes (*see* Doc. 75, Exh. F in '595 case at page 43), and that the ICC affiliation influenced his decision to repurchase the FACT notes, *id.* at page 20, but had no knowledge of any affiliations Smith might have had in the preceding five-plus years that he had been purchasing FACT notes and other financial products from Smith, *see id.* at page 12–13, and that such earlier affiliations were not important to him, *id.* at 29–30. In both cases, the Defendants' lack of reliance upon any affiliation in making their earlier investment decisions (including FACT note purchases) and their strict reliance upon that affiliation in making their later investment decisions is stark, and it could lead a reasonable jury to conclude that the Defendants have overstated their cases.

Finally, the "customer" status issue in this case is, in large part, dependent upon the Defendants' subjective intent at the time of the repurchases—and a movant's subjective intent is an issue particularly ill-suited to determination by summary judgment. *See Carlin Communication, Inc. v. Southern Bell Telephone and Telegraph Co.,* 802 F.2d 1352, 1360 (11th Cir.1986) (noting that "a court should be wary of placing too much reliance on the testimony of the movant regarding facts in its exclusive knowledge in granting a motion for summary judgment") *and see Wilmington Trust Co. v. Manufacturers Life Ins. Co.,* 624 F.2d 707, 709, *reh. den.,* 632 F.2d 895 (5th Cir.1980)[8] (possibility of impeachment sufficient to create genuine issue of material fact with regard to evidence in exclusive knowledge of movant who bears burden of persuasion).

For the reasons stated above, the Court determines that the movants have failed to demonstrate the absence of a genuine issue of material fact in regard to the customer issue, and the Plaintiff is therefore entitled, pursuant to 9 U.S.C. § 4, to a jury trial on this issue.

---

7. In her deposition, Elizabeth Bragg also testified that she could not remember the name of any company with which Smith had been affiliated during the ten years that she and her husband had been making purchases through him before Smith became affiliated with ICC. *See* Doc. 75, Exh. E in '595 case at page 28. She testified that she remembered Smith informing her of his new affiliation with ICC when it occurred, and—again in response to leading questions from her counsel—that the ICC affiliation was so important to her that she would not have made the later FACT note investments if Smith had not had that affiliation. *Id.* at 28–29.

8. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.