**BMA FINANCIAL SERVICES, INC.,**

v.

**Herschel W. GUIN, et al.**

**No. CIV. A. 01–0090.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

Sept. 27, 2001.

---

George C. Gaiennie, III, Howard B. Gist, III, Gist Methvin et al, Alexandria, LA, for Plaintiff.

Kalju Nevasil, Goodman & Nakvasil, Clearwater, FL, for Defendants.

### MEMORANDUM RULING

LITTLE, Chief Judge.

Before this court is a motion to compel arbitration [Doc. No. 8] filed by defendants Herschel W. Guin, Mary Ruth Guin (the "Guins") and Geraldine Gangard (collec-

tively, "Defendant–Investors"), pursuant to Section 4 of the Federal Arbitration Act. *See* 9 U.S.C. §§ 1–16. Plaintiff BMA Financial Services, Inc. ("BMA") opposes the motion. For the following reasons, the Defendants–Investors' motion to compel arbitration is GRANTED.

## BACKGROUND

Between 26 June 1998 and 19 April 1999 (the "Relevant Period"), the Defendant–Investors purchased certain promissory notes (the "Notes") on the recommendation of C.G. Thomason ("Thomason"). The Defendant–Investors claim that Thomason represented himself to be an experienced financial planner and—as elderly investors with virtually no financial experience—the Defendant–Investors relied on Thomason's advice regarding the Notes. The Guins purchased notes issued by Sebastian International Enterprise, Inc. ("Sebastian"), and Geraldine Gangard purchased notes issued by World Vision Entertainment, Inc. ("World Vision"). In all, the Defendant–Investors purchased $227,000 in principal amount of the Notes.

### A. False Representations And Omissions.

The Defendant–Investors claim that Thomason, *inter alia,* failed to disclose material information, or made false representations concerning the Notes. For instance, he failed to disclose that the Notes were not registered with the United States Securities and Exchange Commission or the State of Louisiana, and made numerous fraudulent statements concerning the underlying business of each issuer.

In connection with notes issued by Sebastian, the Defendant–Investors claim Thomason falsely stated that the proceeds from the notes would finance development of an educational television program for children. He also assured the Guins that

the notes were "risk free." The Defendant–Investors claim that the proceeds were actually used to perpetuate a "Ponzi scheme" and to fund the munificent and extravagant lifestyles of Sebastian principals.

In connection with the World Vision notes, Thomason falsely represented that the investment was "low risk," and that the proceeds would be used to develop various entertainment products. As with the notes issued by Sebastian, the Defendant–Investors claim their investment actually supported a "Ponzi scheme," pursuant to which World Vision used nearly all proceeds to pay undisclosed commissions to individuals selling the notes, personal expenses, and interest to other investors.

The Defendant–Investors' underlying claims arise from their purchases of the Notes. Thomason, however, is not a party to this action or the arbitration related to this action. Instead, the Defendant–Investors seek to hold BMA liable for Thomason's alleged wrongful conduct.

### B. Relationships Between BMA, Thomason And The Defendant–Investors.

In this action, BMA does not dispute that Thomason recommended and sold the Notes to the Defendant–Investors. For their part, the Defendant–Investors do not dispute that they never maintained an investment account directly with BMA. The only customer accounts they maintained were with Thomason. The parties are at odds, however, over the relationship that Thomason maintained with BMA. As such, this court has scoured the record to decipher the contours of that relationship.

BMA is a member of the National Association of Securities Dealers, Inc. ("NASD"). On or about 5 May 1998, Thomason signed a Form U–4 Uniform Application For Securities Industry Registra-

tion Or Transfer ("Form U–4") in an effort to become a registered representative of BMA. This form is used by the NASD to capture data regarding the applicant and process registration information. Both the applicant and the NASD member firm that sponsors the filing of the Form U–4 have a duty to provide accurate information on the form. BMA sponsored the filing of Thomason's Form U–4.

Like Thomason, BMA was required to complete various sections of the Form U–4. BMA also had a duty to review and verify the accuracy of the information on the form. For instance, the directions to the Form U–4 require that the employer (BMA) complete item five (5) of the form. Item five (5) on Thomason's Form U–4 indicates that he began employment with BMA on 29 May 1998. Moreover, on 1 June 1998, a representative of BMA reviewed, signed and dated the Form U–4. Before singing the Form U–4, the representative was required to take "appropriate steps to verify the accuracy" of the information on the form. Thus, while this court is aware that a representative of BMA has submitted an affidavit to this court stating that Thomason has never been an employee of BMA, this court finds that the affidavit is in clear conflict with sections of the Form U–4 that were completed and verified by BMA. Consistent with the information from the Form U–4 (and other documents), this court finds that Thomason began his employment with BMA on 29 May 1998. His employment with BMA lasted until 22 April 1999—which was shortly after Louisiana State Securities investigators began to examine BMA in connection with Thomason's activities. On that date, BMA informed Thomason that it was terminating sponsorship of Thomason's Form U–4. Thus, Thomason never became a registered representative of BMA.

Thomason's activities during his ten (10) month period of "regulatory limbo" are largely a mystery. One fact is clear: the Defendant–Investors purchased the Notes through Thomason during that period. No evidence suggests, however, BMA's involvement in any of those transactions. For instance, there is no credible evidence indicating that Thomason ever told the Defendant–Investors that he was affiliated with BMA. Further, Thomason had no authority from BMA to sell the Notes, nor was BMA aware that Thomason was selling the Notes. Finally, there is no evidence that BMA profited in any way from the sale of the Notes. Given these facts, the only possible link between BMA and the Defendant–Investors is their separate and independent relationships with Thomason.

## C. The Arbitration.

The Guins instituted arbitration proceedings against BMA on or about 28 November 2000. On 7 March 2001, the Defendant–Investors filed a First Amended Statement of Claim which included Geraldine Gangard.[1] The Defendant–Investors invoked jurisdiction of the NASD Arbitration Tribunal by virtue of, *inter alia,* BMA's membership in the NASD, the NASD Code of Arbitration Procedure and Thomason's Form U–4 (which contains an arbitration clause). The Defendant–Investors have asserted claims against BMA for breach of contract, fraud, breach of fiduciary duty, negligence and gross negligence.

---

**1.** Anna Hardcastle is also a party to the arbitration. Her claims are brought in connection with investment products purchased from another individual. BMA does not contest the arbitrability of Miss Hardcastle's claims. Accordingly, she is not a party in the action currently before this court.

In the arbitration proceeding, the Defendant–Investors allege that BMA—through Thomason—breached various duties owed to the Defendant–Investors. They seek to hold BMA liable for these breaches under several theories, including failure to supervise.

Subject to the reservation of its rights to proceed in the instant action, on or about 21 March 2001, BMA answered the First Amended Statement of Claim. The hearing in the arbitration is scheduled for 5 November 2001, and discovery has been exchanged between the parties.

### D. The Current Action.

On or about 17 January 2001, BMA filed the original complaint in this action. On 2 July 2001, BMA filed a First Amended Complaint wherein it seeks a declaratory judgment of non-arbitrability and enjoinment of further arbitration proceedings. On 17 July 2001, the Defendant–Investors filed the current motion to compel arbitration.

### DISCUSSION

In deciding the current motion, this court will only address whether the Defendant–Investors may compel BMA to defend their claims in arbitration. *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960). While making this limited determination, the court will not address the merits of the Defendant–Investors' underlying claims, or express any opinion as to their validity.

■ Arbitration is a matter of contract. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). As such, a party will not be required to submit a dispute to arbitration unless the party has agreed to do so. *Id.* Accordingly, when deciding a motion to compel arbitration, courts are to conduct a two-step inquiry—the first step of which is to determine whether the parties agreed to arbitrate the dispute in question. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir.1996). This "first step" involves two considerations: (a) whether there is a valid agreement to arbitrate between the parties; and (b) whether the dispute in question falls within the scope of that agreement. *Webb*, 89 F.3d at 258. When deciding whether the parties have agreed to arbitrate the dispute in question, courts generally apply ordinary state-law principals governing contract formation. *Id.* State law must be applied with due regard to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration. *Id.* The second step of the two-step inquiry is to determine whether legal constraints external to the parties agreement foreclosed the arbitration of those claims. *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S.Ct. at 3355; *Webb*, 89 F.3d at 258.

### I. Did The Parties Agree To Arbitrate These Claims?

In order to determine whether BMA and the Defendant–Investors agreed to arbitrate the claims at issue, this court must determine the following: (a) whether a valid agreement to arbitrate exists between the parties; and (b) whether the claims at issue fall within the scope of that agreement. *Webb*, 89 F.3d at 258. Set forth below is the court's analysis of each inquiry.

### A. An Agreement To Arbitrate.

■ Defendant–Investors argue that BMA's obligation to arbitrate these claims

may be found in two places: NASD Code of Arbitration Procedure, Rule 10301(a) ("Rule 10301(a)" or the "Rule"); and Thomason's Form U–4 (signed and sponsored by BMA). For its part, BMA claims that it never entered into an agreement to arbitrate disputes with the Defendant–Investors.

Although BMA claims that it never entered into an agreement to arbitrate disputes with the Defendant–Investors, BMA recognizes that, as a NASD member, it is required to arbitrate disputes that fall within Rule 10301(a) when no independent agreement to arbitrate exists. *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 55 (2d Cir.2001) (noting that NASD Code requires member firms to arbitrate disputes within Rule 10301(a)). In this case, there is no independent agreement to arbitrate between the Defendant–Investors and BMA. As such, Rule 10301(a) will be the focus of this court's analysis. In relevant part, the Rule requires the submission of:

> **Any dispute, claim or controversy ... between a customer and a member and/or associated person** arising in connection with the business of such member or in connection with the activities of such associated persons ... upon demand of the customer.

*NASD Code of Arbitration Procedure,* Rule 10301(a) (emphasis added). Therefore, under the Rule, "customers" have the power to demand that member firms defend against their claims in arbitration. ■ BMA specifically denies ever entering into an agreement to arbitrate (of any kind) with the Defendant–Investors. An agreement exists, however, if the Defendant–Investors may be considered "customers" under Rule 10301(a). Despite the Defendant–Investors' protestations, the issue of whether they are "customers" entitled to demand arbitration with BMA is

often viewed as a threshold question that goes directly to the existence of an arbitration agreement. *Investors Capital Corp. v. Brown,* 145 F.Supp.2d 1302, 1305 (M.D.Fla.2001) (treating issue of whether would-be arbitration claimant is a "customer" entitled to invoke arbitration as one that speaks to the existence of an arbitration agreement). Thus, until this court determines that the Defendant–Investors were "customers" and are therefore entitled to invoke arbitration pursuant to the Rule, this court may not give the Defendant–Investors the benefit of the federal policy favoring arbitration. This policy requires that all ambiguities be resolved in favor of arbitration, but the weight of this policy may only be used to tip the balance in favor of arbitration when determining the scope of the arbitration agreement— not when determining whether an arbitration agreement exists. *Volt Info. Scis., Inc. v. Board of Trs. of Leland Stanford, Jr. Univ.,* 489 U.S. 468, 475–476, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989).

### 1. *Are The Defendant–Investors Entitled To Demand Arbitration?*

It is clear that narrow definitions of the term "customer" have been widely rejected. *See, e.g., Oppenheimer & Co. v. Neidhardt,* 56 F.3d 352 (2d Cir.1995) (holding that formal account with member firm is not necessary for "customer" status). In fact, a survey of case-law reveals that, for Rule 10301(a) purposes, "customer" has encompassed a very wide-range of relationships, in part, to recognize market realities. *Lehman Brothers, Inc. v. Certified Reporting Co.,* 939 F.Supp. 1333, 1340 (N.D.Ill.1996) (noting that "customer" includes those with less formal business relationships to recognize market realities). At the same time, however, courts have opted not to define the term in ways that might upset the reasonable expectations of

NASD members. *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir.1993) (rejecting requested definition of "customer" so that reasonable expectations of NASD members are not disturbed).

In this case, the Defendant–Investors offer three arguments to explain why they are "customers" entitled to demand that BMA arbitrate the claims at issue. The first argument is based on the "dictionary definition" of the term. In short, the Defendant–Investors claim that a "customer" is defined by the dictionary as "one that buys goods or services." They also note that the NASD Arbitration Code does not define "customer," and the definition in the NASD Manual provides only that "customer" shall not include a broker or dealer. *NASD Manual General Provisions*, Rule 0120(g). Therefore, because each Defendant–Investor is a person that bought goods or services, and no Defendant–Investor falls within the exclusions of 0120(g), they should be given "customer" status under Rule 10301(a), without being required to show that the investment was purchased from BMA or its associated person. Embracing this definition would mean that any investor could be entitled to demand arbitration of a member firm regardless of whether the customer had any relationship (or attempted to establish a relationship) with the member firm, its associated persons, or the employees with whom it intended to arbitrate. In other words, simply by becoming a NASD member, the firm would be agreeing to arbitrate the claims of any person who purchased an investment, not just the claims of their customers, or the claims of their associated persons' customers. Such a boundless definition would surely upset the reasonable expectations of NASD members. Furthermore, this definition has been—at the very least—implicitly rejected by cases the Defendant–Investors cite in their memorandum, and other major cases examining Rule 10301(a). *See, e.g., John Hancock Life Ins. Co.*, 254 F.3d at 59 (requiring that a nexus exist between customer and associated person of member firm before member firm subjected to arbitration); *Wheat, First Sec., Inc.*, 993 F.2d at 820 (requiring that alleged wrongful conduct occur at the time of customer relationship with member firm).[2]

The Defendant–Investors also claim that they are customers of BMA by virtue of their relationship with Thomason. They argue that because Thomason was an associated person of BMA, and they purchased the Notes from Thomason, they have become customers of BMA.

Assuming for now that Thomason was indeed an associated person of BMA, several facts in the record keep this court from trans mortifying the Defendant–Investors into customers of BMA. For instance, at no time did Thomason ever represent to the Defendant–Investors that he was associated with BMA. In fact, the Defendant–Investors were not aware of Thomason's association with BMA during the Relevant Period. As a result, the Defendant–Investors could not have possessed any subjective intent to do business with BMA. *See WMA Sec., Inc. v. Ruppert*, 80 F.Supp.2d 786, 789 (S.D.Ohio 1999) (specifically finding that investors knew of associated person's relationship to member firm before finding that investors were customers of the member firm). Accordingly, nothing in the record shows that

---

2. The Defendant–Investors argue that the impact of the broad definition they propose would be limited because Rule 10301(a) requires that the dispute be "in connection with the business of such member." We explicitly reject this argument and decide the issue in accordance with the weight of authority and with an eye towards reasonable expectations of NASD members. *See Wheat, First Sec., Inc.*, 993 F.2d at 820.

they attempted to establish a business relationship—be it formal or informal—with BMA. *Oppenheimer,* 56 F.3d at 357 (requiring that "customers" attempt to establish relationship with firm); *Investors Capital Corp.,* 145 F.Supp.2d at 1305 (investors not customers of firm despite fact that customers purchased securities from member firm's representative because, *inter alia,* customers made no attempt to establish even an informal relationship with firm). Under these circumstances, this court declines to find that the Defendant–Investors are customers of BMA by virtue of their relationship with Thomason.

Finally, the Defendant–Investors argue that they may demand arbitration against BMA because they were customers of BMA's associated person—Thomason. All parties agree that Rule 10301(a) does not require the Defendant–Investors to be direct customers of BMA. Instead, they fit within the confines of the Rule—and therefore may require BMA to arbitrate—even if they are only customers of BMA's "associated person" and not BMA. *John Hancock Life Ins. Co.,* 254 F.3d at 59.[3]

In *John Hancock,* a somewhat similar case, the aggrieved investors were not customers of the member firm. *Id.* at 51. In fact, they had absolutely no direct relationship with John Hancock. They were merely customers of Fucilo—an associated person of John Hancock. *Id.*

As in this case, the investors' relationship with Fucilo served as the only link between themselves and John Hancock. There was no evidence that Fucilo represented to the investors that he was affiliated with John Hancock (or that the investors knew he was affiliated with John Hancock). *Id.* It was also clear that Fucilo had no authority from John Hancock to sell the fraudulent investment products, nor did the firm have any knowledge that Fucilo offering these products. *Id.* Nonetheless, the investors brought claims against John Hancock and demanded arbitration of those claims. *Id.*

Despite the fact that Fucilo was the only nexus between John Hancock and the investors, the Court of Appeals for the Second Circuit upheld the District Court's ruling which required John Hancock to defend the investors' claims in arbitration. *Id.* at 59. As the court noted when reviewing the language of Rule 10301(a), " 'customer' plainly refers to either the member's or the associated person's customer." *Id.* This court agrees with the Second Circuit's reading of Rule 10301(a). Thus, in accordance with the plain language of the Rule, BMA may be forced to arbitrate these claims if Thomason qualified as an "associated person" of BMA during the Relevant Period.

### 2. Was Thomason An "Associated Person" Of BMA?

A valid agreement to arbitrate exists between BMA and the Defendant–Investors if Thomason may be deemed an "associated person" of BMA during the Relevant Period. Predictably, the parties disagree on this point. At bottom, they disagree on which definition controls the term "associated person" as used in Rule 10301(a).

BMA claims that the applicable definition is found in the NASD Dispute Resolution, Inc. by-laws.[4] These by-laws define "associated person" as follows:

**3.** While BMA concedes this point throughout its memorandum, this court notes that not all courts clearly agree with this reading of Rule 10301(a). *See, e.g., Investors Capital Corp.,* 145 F.Supp.2d at 1308 (concluding that member firm agreed to arbitrate with its customers, rather than the customers of every person associated with it).

**4.** The NASD has several affiliated entities. These entities are subsidiaries of NASD, Inc.

(1) a natural person who is registered under the Rules of the Association; (2) a sole proprietor, partner, officer, director, or branch manager of a member, or other natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member . . . .

*By–Laws of NASD Dispute Resolution, Inc.*, Art. I(v). Under this definition, one cannot be considered an "associated person" until, *inter alia*, he is "registered under the Rules of the Association." Applying this definition to the instant case, Thomason never became an "associated person" of BMA because his application for registration was never approved.

The Defendant–Investors, on the other hand, claim that the appropriate definition of "associated person" may be found in the NASD by-laws. In relevant part, the NASD by-laws define "associated person" as follows:

> (1) a natural person who is registered *or has applied for registration under the Rules of the Association;* . . .

*By–Laws of NASD, Inc.*, Art. I(ee) (emphasis added). Under this definition, one becomes an "associated person" of the firm sponsoring the filing of the Form U–4 upon applying for registration. Applying this definition to the instant case, Thomason became an "associated person" of BMA on or about 1 June 1998. To sup-

port the application of this definition, the Defendant–Investors point to the language of the NASD by-laws and other materials.

After reviewing the arguments of both parties, this court concludes that the Defendant–Investors' position—that Thomason should be regarded as an "associated person" upon filing an application for registration—is well supported by certain language in the by-laws and other materials.[5]

Without delving into the soporific details of the NASD by-laws or the by-laws of NASD affiliated entities, it suffices to say that this court is satisfied that Rule 0121 contained in the NASD Manual General Provisions requires that the term "associated person" as used in Rule 10301(a), have the meaning given in the NASD by-laws. Rule 0121 states, "terms used in the Rules [defined to include Rule 10301(a)] . . . shall have the meaning as defined in the NASD by-laws." *NASD Manual General Provisions*, Rule 0121. Conversely, application of the definition contained in the NASD Dispute Resolution, Inc. by-laws is specifically limited by the preamble in Article I to use in those by-laws. *By–Laws of NASD Dispute Resolution, Inc.*, Art. I.

Other courts have applied the NASD by-law definition of "associated person" to Rule 10301(a). *See, e.g., John Hancock Life Ins. Co.*, 254 F.3d at 50. Additionally,

---

NASD Dispute Resolution, Inc. is one such subsidiary. Its creation was approved in the Fall of 1999 and it was charged—predictably enough—with handling the dispute resolution program (previously part of another subsidiary named NASD Regulation, Inc.). NASD Dispute Resolution, Inc. became operational in the Summer of 2000. *See generally*, 64 Fed.Reg. 55,793 (Oct. 14, 1999).

**5.** It should be noted that the phrase, "or has applied for registration under the Rules of the Association" was added to the definition in the NASD by-laws by amendment on December 1, 1999—after many of the events at issue.

Thus, the parties also disagree about the applicability of the amendment. After reviewing the arguments of both parties, the NASD and NASD Regulation, Inc. ("NASDR") decisions submitted by the Defendant–Investors (indicating that one was considered an "associated person" upon filing a Form U–4 even prior to the amendment), and the statements from the NASD indicating that the amendment was intended only to clarify the definition (and not change it), this court is satisfied that the language of the amendment applies, and reflects the prior practice of the NASD.

the Defendant–Investors have submitted decisions from the NASDR and NASD National Business Conduct Committees supporting the notion that a person becomes associated with a firm upon the filing of a Form U–4. *Third Market Corp.,* 1997 WL 1121327 at *1 (N.A.S.D.R. Nat'l Bus. Cond. Comm. May 21, 1997); *Steven D. Maliagros,* 1994 WL 1067263, at *1 (N.A.S.D. Nat'l Bus. Cond. Comm. Jan. 10, 1994). Accordingly, this court finds that Thomason was an "associated person" of BMA upon the filing of his Form U–4. Thus, a valid agreement to arbitrate exists between the Defendant–Investors and BMA.

### B. Are The Claims Within The Scope Of The Rule?

By finding that Thomason became an "associated person" of BMA upon filing his Form U–4, this court finds only that BMA was linked to Thomason in a way that creates a valid agreement to arbitrate between the Defendant–Investors and BMA. Having decided that a valid agreement to arbitrate exists, this court now turns its attention to whether the claims at issue are sufficiently connected to the business of BMA or the activities of Thomason. When determining whether the claims at issue fall within the scope of Rule 10301(a), this court is required to view the language of the Rule through the prism of the federal policy favoring arbitration. Accordingly, all ambiguities in the scope of the Rule must be resolved in favor of arbitration. *Volt Info. Scis., Inc.,* 489 U.S. at 476, 109 S.Ct. at 1254.

BMA does not dispute that the Defendant–Investors' claims arose in connection with the activities of Thomason. Instead, BMA argues that it lacks any sort of relationship with Thomason. In light of the previous sections of this opinion, and the federal policy favoring arbitration, this court believes that the claims at issue have a sufficient nexus to BMA and fall within the scope of Rule 10301(a). *See John Hancock Life Ins. Co.,* 254 F.3d at 59.

### II. Legal Constraints That Foreclose Arbitration.

BMA has not attempted to show legal constraints that render these claims unarbitrable. After careful review of the record, this court also fails to see any such constraints. Because this court finds that BMA has a duty to arbitrate these claims pursuant to Rule 10301(a), this court sees no reason to address whether the same obligation exists under Thomason's Form U–4 or to decide the other issues raised by the Defendant–Investors.

### III. BMA's Request For A Declaratory Judgment And Injunctive Relief.

This court's decision to grant the Defendant–Investors' motion to compel arbitration effectively disposes of BMA's action for a declaratory judgment and injunctive relief. *Webb,* 89 F.3d at 260 (upholding order dismissing declaratory judgment action because granting motion to compel disposed of the action).

### CONCLUSION

Accordingly, the motion to compel arbitration filed by the Defendant–Investors is GRANTED. BMA's action for a declaratory judgment and enjoinment of further arbitration proceedings is DISMISSED.

### JUDGMENT

For the foregoing reasons, the Defendant–Investors' motion to compel arbitration is GRANTED, and BMA's action for a declaratory judgment and enjoinment of further arbitration proceedings is DISMISSED.