**HORNOR, TOWNSEND & KENT, INC., Plaintiff,**

v.

**Joseph HAMILTON and Millicent Hamilton, Defendants.**

No. CIV.A.1:01–CV–2979–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 6, 2002.

Paul W. Stivers, Jonathan Brennan Butler, Rogers & Hardin, Atlanta, GA, Chris-

tian R. Bartholomew, phv, Randi Perry Spallina, phv, Morgan, Lewis & Bockius, Miami, FL, for Horner, Townsend & Kent, Inc.

J. Pat Sadler, Sadler & Hovdesven, Atlanta, GA, Joel A. Goodman, phv, Goodman & Nekvasil, Clearwater, FL, for Joseph Hamilton, Millicent Hamilton.

## ORDER

CARNES, District Judge.

The above-captioned action is before the Court on plaintiff's Motion for Preliminary Injunction [3], defendants' Motion for Protective Order to Preclude Discovery [8], and defendants' Motion for Order Directing Arbitration [27].

The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that plaintiff's Motion for Preliminary Injunction [3] should be **DENIED,** defendants' Motion for Protective Order to Preclude Discovery [8] should be **GRANTED,** and defendants' Motion for Order Directing Arbitration [27] should be **GRANTED.**

## BACKGROUND

This dispute arose over the purchase of investments in payphones by Joseph and Millicent Hamilton (the "Hamiltons"). The Hamiltons allege that they lost $364,000 when they purchased fraudulent, unregistered securities from investment broker Tommy Fountain ("Fountain"). They further allege that Fountain was acting as a registered agent for Hornor, Townsend & Kent, Inc. ("HTK"), a brokerage firm, when he sold them the investments, and the Hamiltons seek to hold HTK responsible for their losses. They have filed a Statement of Claim against HTK, seeking arbitration before the National Association of Securities Dealers ("NASD").

After the Hamiltons filed their Statement of Claim, HTK filed the instant action for Declaratory and Injunctive Relief, seeking a Declaratory Judgment that no agreement to arbitrate exists between HTK and the Hamiltons that would require HTK to participate in the arbitration, and seeking an Order from this Court staying the arbitration. HTK argues that it is not required to participate in arbitration with the Hamiltons, because it never agreed to arbitrate any dispute with them. HTK contends that, contrary to the Hamiltons' allegations in their Statement of Claim, they did not purchase the allegedly fraudulent investments from Tommy Fountain, but instead purchased the investments from his son, Scott Fountain, who was not associated with HTK in any way. Thus, HTK contends that the Hamiltons were never customers of HTK and that it can not be liable for any alleged losses they may have sustained on the investments purchased from Scott Fountain.

HTK thereafter filed a Motion for Expedited Discovery [2] and a Motion for a Preliminary Injunction [3] to preclude the Hamiltons from proceeding with the arbitration. The Hamiltons responded by filing a Motion for Protective Order [8] to preclude discovery, arguing that HTK is seeking discovery that would not be allowed under the arbitration procedures. After hearing argument on these motions via telephone conference on January 31, 2002, this Court orally denied HTK's Motion for Expedited Discovery [2] and temporarily granted the Hamiltons' Motion for Protective Order [8] to preclude discovery. The Court further ordered the parties to

file supplemental briefs and reserved ruling on HTK's Motion for Preliminary Injunction [3] until after the briefs had been filed. In connection with filing their supplemental brief on the pending motions, the Hamiltons also requested an Order from the Court Directing Arbitration [27]. For the reasons discussed below, the Court concludes that a valid agreement to arbitrate exists between the parties and that the agreement requires HTK to submit to arbitration.

## FACTS

It is undisputed that the Hamiltons purchased investments in ETS payphones in 1999 and that they lost money as a result of those investments. It is also undisputed that Tommy Fountain was a registered agent of HTK at the time the Hamiltons purchased the allegedly fraudulent investments. The remainder of the facts surrounding the Hamiltons' purchase of the investments, particularly the extent of Tommy Fountain's involvement in the sale of those investments, is disputed. The Court will summarize the relevant facts as alleged in the Hamiltons' Statement of Claim, and will address those facts disputed by HTK when the dispute is relevant to the issues presented in this action.

On April 27, 2001, Joseph and Millicent Hamilton (the "Hamiltons") filed a Statement of Claim against the securities brokerage firm Hornor, Townsend & Kent, Inc. ("HTK"), seeking arbitration before the National Association of Securities Dealers ("NASD"), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq. (Statement of Claim, attached as Ex. A to Pls. Motion for Preliminary Injunction [3].) At the time they filed their Statement of Claim, Mr. Hamilton was sixty-four years old and Mrs. Hamilton

was fifty-five. (*Id.* at ¶ 13.) The Hamiltons live in a retirement community in Loudon, Tennessee, a town near the Georgia border. (*Id.* at ¶ 2.) They allege that they were customers of Tommy Fountain ("Fountain"), an investment broker whose office was located in Cartersville, Georgia, and contend that they lost $364,000 of their savings as a result of purchasing fraudulent investments on Fountain's advice. (*Id.* at ¶¶ 3, 13–14.)

According to the Hamiltons, they met Fountain at the clubhouse of their retirement community, where he sponsored a free luncheon and investment presentation for the residents. (*Id.* at ¶ 13.) The Hamiltons filled out a form during that presentation, and Fountain subsequently met with them in their home to discuss possible investment opportunities. (*Id.*) The Hamiltons contend that Fountain represented that he was a broker with HTK, and they explained to Fountain that they were risk-averse and sought safe, conservative investments. (*Id.*) They allege that, during several visits to their home and telephone calls, Fountain recommended that they invest in payphones offered by an entity known as ETS Payphone Equipment Inc. ("ETS"), and represented to them that the ETS management was reputable and had a "very long, positive history of success." (*Id.*) The Hamiltons claim that Fountain advised them that ETS was a "safe investment that would pay them 14% interest and was particularly appropriate for senior citizen retirees." (*Id.*) As a result of Fountain's recommendation, the Hamiltons invested $238,000 in ETS on October 1, 1999, and invested $126,000 on December 1, 1999, for a total investment of $364,000. (*Id.* at ¶ 14.)

Contrary to Fountain's recommendations, however, ETS was not a safe invest-

ment that was appropriate for conservative retirees, but was instead a "massive fraudulent investment scheme." (*Id.* at ¶ 15.)[1] The Hamiltons contend that Fountain neglected to disclose that ETS had been failing to make a profit and was losing money on its payphone program. (*Id.*) Further, ETS investments were not registered with the States of Tennessee or Georgia or the SEC, in violation of the federal securities laws, and the Hamiltons contend that Fountain failed to disclose that fact to them as well. (*Id.*) The Hamiltons also contend that Fountain concealed the true facts about ETS from them for several months after they purchased the investments, and that they did not find out the true financial condition of ETS and the true nature of their investments until late in 2000. (*Id.* at ¶ 23.) They allege that they lost $364,000, the full amount of their investment in ETS. (*Id.* at ¶ 46.) They are seeking to hold HTK liable for those losses through the NASD arbitration process, and have alleged that HTK, through Fountain, committed multiple violations of the federal securities laws and the laws of both Tennessee and Georgia. They further allege that HTK was negligent in its supervision of its agent Fountain.

HTK does not dispute that Fountain was associated with HTK as a registered agent from September 11, 1999, until he was terminated on July 11, 2001. (Mulrooney Decl. at ¶ 7.) According to HTK, however, the Hamiltons were not customers of Fountain, but were instead customers of his son, Scott Fountain, and "The Fountain Financial Group." (*Id.* at ¶ 12.) It is undisputed that Scott Fountain was not a registered agent of HTK at any time and

was never associated with HTK in any way. (*See id.* at ¶ 8.) It is also undisputed that the Hamiltons never opened an account with HTK and never received account statements from HTK or any other documentation indicating that they had an account with HTK. (*See id.* at ¶ 5.) Thus, HTK contends that the Hamiltons were never customers of HTK or Fountain, and therefore, HTK is not required to participate in arbitration with the Hamiltons because there is no agreement between the parties to arbitrate any disputes.

After the Hamiltons filed their Statement of Claim, HTK filed the instant action in this Court seeking a Declaratory Judgment that it is not required to submit to arbitration and seeking an Order staying the arbitration proceedings. HTK thereafter filed a Motion for a Preliminary Injunction [3] to preclude the Hamiltons from proceeding with the arbitration. The Hamiltons responded by filing a Motion for Protective Order [8] to preclude discovery, arguing that HTK is seeking discovery that would not be allowed under the arbitration procedures. In connection with filing their supplemental brief on the pending motions, the Hamiltons also requested an Order from the Court Directing Arbitration [27].

For the reasons discussed below, the Court concludes that a valid agreement to arbitrate exists between the parties and HTK is required to submit to arbitration. Accordingly, plaintiff's Motion for Preliminary Injunction [3] is **DENIED,** defendants' Motion for Protective Order to Preclude Discovery [8] is **GRANTED,** defendants' Motion for Order Directing Arbitration [27] is **GRANTED.** Because the

---

**1.** In the first six months of the year 2000, ETS lost more than $33 million, and on September 11, 2000, ETS filed for bankruptcy. *See SEC* *v. ETS Payphones, Inc.,* 123 F.Supp.2d 1349, 1352 (N.D.Ga.2000) (Camp, J.).

Court concludes that HTK is not entitled to a Declaratory Judgment, this action is **DISMISSED**.

### DISCUSSION

#### I. The Threshold Issue of Arbitrability

As discussed above, the Hamiltons have sought to use the NASD arbitration process to resolve their dispute with HTK, but HTK has refused to participate in the arbitration, and has asked this Court for a Declaratory Judgment that it is not required to do so. Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (the "FAA"), the proper action for a party to take when the other side is refusing to arbitrate is to bring a motion to compel, as defendants have done in this case when they requested an Order from this Court directing HTK to participate in the arbitration. *See* 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.") Section 4 of the FAA further provides:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. ... If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

*Id.*

In enacting the FAA, "Congress declared a national policy favoring arbitra-

tion." *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). "However, the policy fostered by the FAA 'does not require parties to arbitrate when they have not agreed to do so.'" *Wheat, First Secs., Inc. v. Green*, 993 F.2d 814, 817 (11th Cir.1993) (quoting *Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). As the Eleventh Circuit stated, "[s]imply put, parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851, 854 (11th Cir.1992); *see also Wheat, First Secs.*, 993 F.2d at 817.

"It is, therefore, rudimentary that 'the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.'" *Wheat, First Secs.*, 993 F.2d at 817 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)); *see also PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir.1990) ("Before compelling an unwilling party to arbitrate, § 4 therefore requires the court to engage in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.") When the facts of the case call into question whether an agreement to arbitrate existed between the parties, it is the district court's responsibility to determine that issue. *See Wheat, First Secs.*, 993 F.2d at 819.

The question before this Court, therefore, is whether the parties entered into a valid enforceable agreement to arbitrate the claims presented by the Hamiltons. Ordinarily, when an arbitration clause ex-

ists in a contract signed by both parties, there is a presumption that arbitration is required and the district court should compel arbitration. *Chastain,* 957 F.2d at 854. This presumption of arbitration would encompass even claims related to the validity of the contract itself. *Id.; see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). When there is no contract signed by both parties, however, and one of the parties challenges the existence of any agreement at all, including an agreement to arbitrate, the district court must look further to determine whether there is an enforceable agreement to arbitrate before it can compel arbitration. *Chastain,* 957 F.2d at 854.

The Eleventh Circuit has applied a "two-component test" for determining whether the arbitrability question should be litigated before the district court. *Wheat, First Secs.,* 993 F.2d at 817; *Chastain,* 957 F.2d at 854. First, the party seeking to avoid arbitration must unequivocally deny that an agreement to arbitrate was reached, and second, it must offer "some evidence" to substantiate that denial. *Wheat, First Secs.,* 993 F.2d at 817; *Chastain,* 957 F.2d at 854 (citing *T & R Enters., Inc. v. Cont'l Grain Co.,* 613 F.2d 1272, 1278 (5th Cir. 1980)). A party must meet this threshold burden before it will be entitled to litigate the matter before the district court. If a party fails to do so, the district court has no choice but to compel arbitration. *See Chastain,* 957 F.2d at 855 ("A party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists. Rather, that party must substantiate the denial of the contract with enough evidence to make the denial colorable."); *see also Wheat, First Secs.,* 993 F.2d at 819; *Cancanon v. Smith Barney, Harris, Upham & Co.,* 805 F.2d 998, 1000–01 (11th Cir.1986).

If the party opposing arbitration meets that threshold burden, the district court can not compel arbitration before determining whether a valid agreement to arbitrate exists. Two general principles provide guidance on whether specific asserted claims are eligible for arbitration. First, the Supreme Court cautions that a court considering arbitrability "is not to rule on the potential merits of the underlying claims." *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Even if it appears to the reviewing court that the claims asserted are meritless or even frivolous, it must not allow those considerations to interfere with its determination of arbitrability. *Id.* Second, the Supreme Court has instructed that there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* at 650, 106 S.Ct. 1415 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Thus, silence or ambiguity with respect to whether a particular claim is within the arbitration agreement is interpreted in favor of arbitration. *See e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Accordingly, an injunction against arbitration is appropriate only where an asserted claim "clearly falls outside of the substantive scope of the agreement." *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 513 (3d Cir.1990).

With all these considerations in mind, the Court must review the record and be "satisfied" that the parties had an agree-

ment to arbitrate before it can compel HTK to participate in arbitration. *See* 9 U.S.C. § 4. It is undisputed that the parties never actually signed a formal agreement to arbitrate any disputes; thus, there is no presumption that a valid agreement exists. Nevertheless, the Hamiltons contend that HTK, by virtue of its membership status in NASD as a registered broker-dealer, entered into an agreement to arbitrate all disputes with its customers, or customers of its registered agents, arising out of connection with its business. HTK argues that the Hamiltons were not its customers, nor those of Fountain, its registered agent; therefore, according to HTK, it never agreed to arbitrate any disputes with the Hamiltons.

## II. *The Scope of NASD Rule 10301*

 The Hamiltons allege in their Statement of Claim that HTK, as a member of the NASD, is required to arbitrate the claims at issue under NASD Rule 10301. (Statement of Claim at ¶ 1.) The NASD Code of Arbitration Procedure binds its members to arbitrate a wide variety of claims with a broad range of claimants, including claimants that may have no direct relationship to the member. *See John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 55 (2d Cir.2001). HTK admits that it is a member of NASD and that it is bound by the NASD rules: "HTK is, however, a member of the NASD and, as a

result, has a standing agreement to arbitrate certain disputes with its customers." (Pls. Motion for Prelim. Inj. [3] at 5.) Accordingly, the parties agree that Section 10301 of the NASD Code governs the scope of claims required to be submitted to arbitration.[2]

Rule 10301(a) of the NASD Code of Arbitration Procedure provides, in relevant part, as follows:

> Any dispute, claim, or controversy ... between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

NASD Code § 10301(a) (attached as Ex. C to Pls. Motion for Prelim. Inj. [3]). Thus, under the plain language of Rule 10301, in order for a claim to fall within this mandatory arbitration provision, it must be a dispute between a "customer" and a "member and/or associated person," and the dispute must arise "in connection with the business" of the member or "in connection with the activities" of the associated person. *See Vestax Sec. Corp. v. McWood,* 280 F.3d 1078, 1081 (6th Cir. 2002); *John Hancock Life Ins. Co.,* 254 F.3d at 59.

---

**2.** In *Wheat, First Secs., Inc. v. Green,* 993 F.2d 814, 820 (11th Cir.1993), the Eleventh Circuit left open "the tantalizing question" whether the NASD Code binds its members to submit to arbitration of claims brought by third parties. Despite the Eleventh Circuit's failure to rule on this issue, one district court in this Circuit has stated that "[I]t is now fairly established that a person or entity's contractual agreement with the New York Stock Exchange ('NYSE') or the NASD which obligates

the person/entity to arbitrate according to NYSE or NASD arbitration provisions may be enforced by a non-party to the agreement— even though there is no *direct* agreement between the party seeking to invoke arbitration and the party seeking to avoid it." *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.,* 65 F.Supp.2d 1371, 1378 (S.D.Fla.1999). In any event, HTK concedes that is bound by the provisions of the NASD Code to arbitrate certain claims with its "customers."

HTK contends that the Hamiltons' claims are not covered under Rule 10301 because, it argues, the Hamiltons were never "customers" of HTK, and therefore, HTK is not required to arbitrate any claims brought against it by the Hamiltons. It is undisputed that the Hamiltons never officially opened an account with HTK or received any account statements from HTK or otherwise entered into a direct agreement with HTK. Nevertheless, the Hamiltons contend that they were customers of Tommy Fountain, and because Tommy Fountain was an "associated person" of HTK, their claims against HTK are covered under Rule 10301.

HTK argues at length in their various briefs that HTK never sold ETS investments to anyone, including the Hamiltons, and that the Hamiltons were never customers of HTK; therefore, HTK contends that it never entered into any valid agreement with the Hamiltons to arbitrate any disputes with them. (*See* Pls. Motion for Prelim. Inj. [3] at 12–14.) These arguments are irrelevant, because the Hamiltons do not contend that HTK sold them the ETS investments directly; instead, they contend that they purchased the ETS investments on the advice and recommendation of Tommy Fountain, an associated person of HTK. Under the plain language of Rule 10301, the Hamiltons are not required to show that they were customers of HTK directly, because their claims against HTK are nevertheless subject to mandatory arbitration if they were customers of an associated person of HTK and their claims arise in connection with the activities of that associated person. *See Vestax Sec. Corp.*, 280 F.3d at 1081; *John Hancock Life Ins. Co.*, 254 F.3d at 59.

HTK argues in its Motion for Preliminary Injunction [3] that "even if the Ham-

iltons were, in fact, customers of Tommy Fountain, that alone is not enough to require HTK to arbitrate their dispute." (Pls. Motion for Prelim. Inj. [3] at 3.) In support of this argument, HTK cites *Investors Capital Corp. v. Brown*, 145 F.Supp.2d 1302, 1304 (M.D.Fla.2001). That court held that:

> [I]n joining the NASD, ICC agreed to arbitrate disputes with *its* customers, rather than the customers of every person associated with ICC. The opposite construction of Rule 10301, the Court concludes, would do significant injustice to the reasonable expectations of NASD members. To compel arbitration as "customers," the Defendants must establish that they were ICC customers at the time of the transactions giving rise to their arbitration claims. Because they did not have ICC accounts or other evidence of a traditional customer relationship with ICC, the Defendants must show that they established an informal business relationship with ICC, or at least attempted to do so.

*Investors Capital Corp.*, 145 F.Supp.2d at 1308 (emphasis in original) (internal quotes and citations omitted).

The Court rejects this holding by the court in *Investors Capital Corp.*, because it is contrary to the plain language of Rule 10301. Rule 10301 states that any dispute "between a customer and a member and/or associated person" that arises in "in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code." NASD Code § 10301. The Court has reviewed the cases cited by the parties, and has conducted a thorough review of other cases that have addressed this issue, and has been unable to uncover any other decision other than *Investors*

*Corp.* holding that a NASD member is not required to arbitrate claims brought by the customer of an "associated person." Indeed, every other court that has addressed this issue has reached a contrary result; *i.e.,* a claim brought by a customer of an associated person plainly falls within the scope of Rule 10301, and is subject to the mandatory arbitration procedure. *See, e.g., John Hancock Life Ins. Co.,* 254 F.3d at 59–60 (expressly rejecting holding of *Investors Corp.* as contrary to plain language of Rule 10301); *see also Vestax Sec. Corp.,* 280 F.3d at 1081–1082 (customers of an associated person entitled to arbitration); *BMA Fin. Servs., Inc. v. Guin,* 164 F.Supp.2d 813, 820 (W.D.La.2001) (" 'customer' plainly refers to either the member's or the associated person's customer"); *Vestax Sec. Corp. v. Skillman,* 117 F.Supp.2d 654, 657 (N.D.Ohio 2000) ("The fact that defendants never opened accounts with plaintiff is irrelevant. By conducting business with plaintiff's registered representative, defendants conducted business with plaintiff and became its customers.") (citing *WMA Sec., Inc. v. Ruppert,* 80 F.Supp.2d 786, 789 (S.D.Ohio 1999)); [3] *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.,* 65 F.Supp.2d 1371, 1381–1382 (S.D.Fla.1999) (NASD member forced to arbitrate a claim brought by a customer of an associated person, even when the account was held at another brokerage firm).

Despite HTK's argument in its brief that it is not required to arbitrate because the Hamiltons were not customers of HTK, counsel for HTK conceded during oral argument that if the Hamiltons are able to establish that Tommy Fountain sold them the ETS investments, HTK would be forced to arbitrate the claims. (*See* Tr. of Hrg. February 15, 2002[26] at 29.) As the Court stated:

> Let's say in the depositions that Mr. Tom Fountain and/or his son confirmed that in fact he stood up in a room with people and he vouched using his [HTK] credentials that this was a good investment and that they then bought it. And let's say then there is no dispute. Everybody agrees. Where are we? Where is your client at that point if that happens?
>
> [Counsel for HTK]: I think if that happens and if the Hamiltons corroborate that, we are in arbitration.... Without any doubt. And we'll live with that.

(Tr. of Hrg. February 15, 2002[26] at 29–30.)

It is undisputed that Tommy Fountain was associated with HTK as a registered agent from September 11, 1999, until he was terminated on July 11, 2001. Thus, there is no dispute that he was an "associated person" of HTK at the time the Hamiltons purchased the ETS investments in late 1999. (*See* Mulrooney Decl. at ¶ 7.) According to HTK, however, the Hamiltons were not customers of Tommy Fountain, but were instead customers of his

**3.** Some courts have gone further than the language of Rule 10301 and have held that investors who were customers of an associated person *became* customers of the member by virtue of their relationship with the associated person. *See, e.g., Vestax Sec. Corp. v. Skillman,* 117 F.Supp.2d 654, 657 (N.D.Ohio 2000) ("The fact that defendants never opened accounts with plaintiff is irrelevant. By conducting business with plaintiff's registered representative, defendants conducted business with plaintiff and became its customers."); *WMA Sec., Inc. v. Ruppert,* 80 F.Supp.2d 786, 789 (S.D.Ohio 1999) (same). This Court is unwilling to hold that a customer of an associated person is automatically a customer of the member, but the distinction is irrelevant for the purposes of Rule 10301, as the claims of a customer of *either* the member *or* an associated person are subject to mandatory arbitration.

son, Scott Fountain, and it is undisputed that Scott Fountain was not a registered agent of HTK at any time and was never associated with HTK in any way. (*See id.* at ¶ 8.) Thus, the issue before the Court is whether the Hamiltons were "customers" of Tommy Fountain when they purchased the ETS investments.

### III. Were the Hamiltons "Customers" of Tommy Fountain?

■ As discussed above, the Hamiltons must establish that they were "customers" of Tommy Fountain for their claims to fall within the scope of Rule 10301. Rule 10301 of the NASD code does not define the term "customer," nor does any other provision of the NASD Code provide a definition, except to exclude "a broker or dealer." NASD Code § 0120(g); *see also John Hancock Life Ins. Co.,* 254 F.3d at 59; *Oppenheimer & Co. v. Neidhardt,* 56 F.3d 352, 357 (2d Cir.1995). Courts have uniformly held that the term "customer" is to be defined very broadly for the purpose of analyzing whether a claim is subject to the mandatory arbitration provision of Rule 10301. *See, e.g., John Hancock Life Ins. Co.,* 254 F.3d at 59–60 (NASD Code defines "customer" as anyone other than a broker or dealer); *BMA Fin. Servs., Inc. v. Guin,* 164 F.Supp.2d 813, 818 (W.D.La. 2001) (narrow definitions of "customer" have been widely rejected); *WMA Sec., Inc. v. Ruppert,* 80 F.Supp.2d at 789 (a broad interpretation of "customer" includes those who had informal relationships with NASD members or associated persons); *First Montauk,* 65 F.Supp.2d at 1381 ("customer" should be interpreted broadly under NASD Code to recognize market reality).

In their Statement of Claim, the Hamiltons allege that Fountain personally came to their home to discuss investment opportunities, represented that he was a broker with HTK, and recommended the ETS investment as a safe, conservative investment that was consistent with their stated investment objectives. The Hamiltons claim that Fountain advised them that ETS was a "safe investment that would pay them 14% interest and was particularly appropriate for senior citizen retirees." (Statement of Claim at ¶ 13.) They allege that they relied on Fountain's recommendation in deciding to invest $364,000 in the ETS payphones. (*Id.* at ¶ 14.)

As further support for their allegations in their Statement of Claim, the Hamiltons have provided a joint affidavit stating as follows:

2. We knew and believed that Tommy L. Fountain was a licensed broker and securities representative for the brokerage firm of Hornor, Townsend & Kent, Inc. ("HTK") prior to, during, and after our purchase of ETS Payphone Equipment Inc. investment ("ETS"). Tommy L. Fountain's son, Edward Scott Fountain, also was present and participated in discussions concerning our purchase of ETS; however, Tommy L. Fountain's representations and recommendations were the most important factors in these purchases. We relied upon and followed our HTK broker's (Tommy L. Fountain's) investment advice and recommendation to invest in ETS on the below-listed dates and in the corresponding amounts invested . . . .

3. Prior to each of the above-listed ETS investments we made, Tommy L. Fountain identified himself as and represented to us that he was a licensed HTK securities broker. We met with and spoke to him on several occasions concerning his investment advice and recommendation to purchase ETS.

4. Tommy L. Fountain assured us, among other things, that an investment in ETS was a safe investment appropriate for senior citizen retirees. We have now lost all our savings invested in ETS.

5. We purchased the above-listed ETS investments in reliance upon Tommy L. Fountain's representations that he was a broker with HTK, a reputable brokerage firm. We assumed that HTK was supervising Tommy L. Fountain and was reviewing and approving all of his investment advice and ideas to us. We believed we were customers of Hornor, Townsend & Kent, Inc. and Tommy L. Fountain before, during, and after our purchase of ETS as listed above.

(Hamiltons Aff. at ¶¶ 2–5, Defs. Opposition to Pls. Mot. for Prelim. Inj. [9], Ex. 5.)

The Hamiltons have also provided further evidence as support for their contention that they were customers of Tommy Fountain. They have produced three letters purportedly from Tommy Fountain, on letterhead from "The Fountain Financial Group," dated, respectively, December 2, 1999; November 7, 2000; and November 14, 2000. (Defs. Opp. to Pls. Mot. for Prelim. Inj. [9], Ex. 6.) Only the first letter dated December 2, 1999 is signed "Tommy," and it states: "If you have any questions, give me a call. I enclosed a return Fed Ex envelope for your convenience." (*Id.*) The second letter, dated November 7, 2000, purports to be from both Scott Fountain and Tommy Fountain, but is not signed by either. It states:

Dear Joe:

On behalf of the Fountain Financial Group, please allow us to apologize for the lack of information on the situation of ETS. We are doing our best to forward updated information to you as we receive it. Enclosed is the latest update from ETS.

As investors ourselves, we understand the concern and distress you may be experiencing. Please know, we are doing everything possible on your behalf. Our lawyer is present at all hearings and meetings concerning the ETS bankruptcy.

If you have any questions, feel free to call us and we will answer your question to the best of our knowledge.

(*Id.*)

Finally, the third letter, dated November 14, 2000, also purports to be from both Scott Fountain and Tommy Fountain, but is signed by neither. (*Id.*) It states:

Dear Joe:

Enclosed is the latest information we have received on the ETS Bankruptcy procedures. We have a lawyer representing all of us. We should be hearing something in the next few weeks. Thank you for your patience. We will continue to keep you posted.

(*Id.*)

The Hamiltons have also provided excerpts from a newsletter and a brochure purportedly from The Fountain Financial Group. (*Id.*, Ex. 7–8.) The newsletter excerpt is one page titled "Golden Strategies: A Practical Guide Financial Guide to Your Retirement." (*Id.*, Ex. 7.) Beneath the title is the name "The Fountain Financial Group," with the firm's address, phone number, and website address. (*Id.*) Next to the firm name is a photograph of Scott Fountain. (*Id.*) Although there is no mention of Tommy Fountain's name on this page, at the very bottom of the page it states: "Securities offered through Hornor, Townsend & Kent, 600 Dresher Road,

Horsham, PA. Member NASD/SIPC." (*Id.*) Moreover, the excerpt from the brochure indicates that Tommy Fountain is Vice President of Operations for The Fountain Financial Group. (*Id.*, Ex. 8.)

The Hamiltons' final piece of evidence that they were customers of Tommy Fountain when they invested in the ETS payphones in 1999 is a copy of a letter dated October 18, 2000, from Tommy Fountain to "Mr. Sweeney," but it is also not signed. (Defs. Supplemental Response to Pls. Mot. for Prelim. Inj. [27], Ex. 2.) The identity or title of "Mr. Sweeney" is not clear from the record, but the letter states as follows:

> This is in response to your letter concerning outside business activities.... I am not an owner of the Fountain Financial Group. My son Scott Fountain, is the owner of the LLC, I am just an agent.... Being new in the business in 1998 and thru plain ignorance, **I was involved in the sale of a few payphones** and nine-month notes. I have had no dealings with any of these companies since 1999.

(*Id.* (emphasis added).)

Thus, the Hamiltons contend that they have provided more than sufficient evidence that they were customers of Tommy Fountain, and that their claims against HTK are subject to mandatory arbitration under Rule 10301. Furthermore, although they have provided evidence to support their claims, the Hamiltons argue that the Court need look no further than the allegations in their Statement of Claim to find that they were "customers" of Tommy Fountain when they purchased the ETS investments. In support of this argument, they have cited a recent decision from the Southern District of New York that liberally construed the investors' Statement of Claim that the claimants had been led to believe that they had a "customer-like" relationship with the plaintiff, and therefore, the court held that the claim should be submitted to arbitration. *Bensadoun v. Jobe–Riat,* No. 01 Civ. 10895, 2002 U.S. Dist. LEXIS 106 (S.D.N.Y. Jan. 2, 2002). The *Bensadoun* court did not appear to review any evidence offered by any of the parties, but merely relied on the allegations of the Statement of Claim to find that the claims fell within the scope of Rule 10301, even though the plaintiff contended that the investors were not his customers. *Id.* The court explained:

> Here, the Statement of Claim, liberally construed in favor of the complainants, alleges that the plaintiff and one Michael Autard, acting in concert, jointly and severally led the claimants to believe that they had a customer-like relationship with plaintiff and his firm, a belief on which they relied to their detriment. This is sufficient, on the present sparse record, to support sending the matter to arbitration (without prejudice to any subsequent determination the arbitrators may make, on a fuller record, as to their jurisdiction).

*Id.* at *1–2. Thus, even when the investors admitted that the plaintiff had acted "in concert" with another, the *Bensadoun* court held that further discovery was not necessary to determine whether the investors were customers of the plaintiff, but left that question open for the arbitrators. *Id.*

As discussed above, in the Eleventh Circuit, the law is clear that, when a party challenges the existence of an agreement to arbitrate, it is the obligation of the district court to determine whether an agreement exists. *Wheat, First Secs., Inc. v. Green,* 993 F.2d 814, 817 (11th Cir.1993).

Furthermore, the Court must follow the "two-component test" for determining whether the party challenging arbitration is entitled to litigate the matter fully before the court, pursuant to Section 4 of the FAA.[4] *Wheat, First Secs.,* 993 F.2d at 817; *Chastain v. Robinson–Humphrey Co.,* 957 F.2d 851, 854 (11th Cir.1992). First, the party seeking to avoid arbitration must unequivocally deny that an agreement to arbitrate was reached, and second, it must offer "some evidence" to substantiate that denial. *Wheat, First Secs.,* 993 F.2d at 817; *Chastain,* 957 F.2d at 854 (citing *T & R Enters., Inc. v. Cont'l Grain Co.,* 613 F.2d 1272, 1278 (5th Cir.1980)).

In the instant action, HTK has unequivocally denied that an agreement to arbitrate was reached, because, it argues, the Hamiltons were never customers of Tommy Fountain, and therefore, their claims do not fall within the scope of NASD Rule 10301. Moreover, HTK contends that it has offered at least "some evidence" to dispute the Hamiltons' allegations, and seeks an order from the Court allowing the parties to pursue further discovery on the issue of whether the Hamiltons were customers of Tommy Fountain.

In support of its argument that the Hamiltons were not customers of Tommy Fountain, HTK has produced the declaration of Nina M. Mulrooney, a "Registered Principal" of HTK. (Mulrooney Decl., attached as Ex. B to Pls. Motion for Prelim. Inj. [3].) Mulrooney states that the declaration is based upon "personal knowledge, review of relevant corporate records

and/or inquiry of relevant individuals." (*Id.* at ¶ 3.) She further states as follows:

6. To the best of my knowledge, neither HTK nor anyone else provided the Hamiltons with any documentation to indicate that these securities were issued by, distributed through, or in any way affiliated with HTK....

11. No associated person of HTK is, or ever has been, authorized to offer for sale ETS Payphones, Inc., investments.

12. Scott Fountain conducted investment seminars, with his father, under the name "The Fountain Financial Group." The cover page of a brochure for "The Fountain Financial Group," attached hereto as Exhibit A and which was attached to the Hamilton's NASD Statement of Claim (as Exhibit D), prominently features a picture of Scott Fountain and does not mention Tommy Fountain. *See* Exhibit A....

14. Tommy Fountain has admitted to HTK personnel that Scott Fountain was involved in selling ETS payphones and that, although Tommy Fountain was present for Scott Fountain's telephone calls pitching the phone investments (but not necessarily ETS investments), Tommy said nothing.

15. Tommy Fountain also informed HTK personnel that the contract for selling ETS investments was solely between Scott Fountain and ETS, that Tommy's name was not on any ETS paperwork and that, indeed, Tommy Fountain could not sign any ETS paperwork.

---

4. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.") During oral argument, counsel for HTK indicated that HTK was not seeking a jury trial, but a summary trial before the

Court. (Tr. of Hrg. at 32.) In any event, at this stage of the proceedings, HTK is merely seeking an Order from the Court allowing the parties to take depositions and other discovery to determine whether the Hamiltons were customers of Tommy Fountain.

(Mulrooney Decl. at ¶¶ 6, 11, 12, 14, 15.)[5] HTK argues that this evidence demonstrates that there is a genuine issue of fact with respect to whether the Hamiltons were customers of Tommy Fountain.

The Hamiltons have objected to much of the testimony presented in Mulrooney's declaration as "triple hearsay," and the Court agrees somewhat with that characterization. Mulrooney states that Tommy Fountain "admitted to HTK personnel" and "informed HTK personnel" of certain facts, but it is not clear who these "HTK personnel" were who subsequently informed Mulrooney what Tommy Fountain had told them. Furthermore, Mulrooney's declaration is internally contradictory. She states that, "to the best of [her] knowledge," nobody ever provided the Hamiltons with "documentation to indicate that these securities were issued by, distributed through, or in any way affiliated with HTK," but in another paragraph, she references a "brochure" attached to the Hamiltons' Statement of Claim that does exactly that.

As discussed above, the Hamiltons have provided an excerpt from a newsletter or brochure from The Fountain Financial Group, which they also attached to their Statement of Claim as Exhibit D, that states at the very bottom: "Securities offered through Hornor, Townsend & Kent, 600 Dresher Road, Horsham, PA. Member NASD/SIPC." (Defs. Opp. to Pls. Mot. for Prelim. Inj. [9], Ex. 7; Statement of Claim, Ex. D.) Although Mulrooney's declaration indicates that a copy of this brochure page has been attached to her declaration as "Exhibit A," there is no Exhibit A attached; she further indicates that it is the same document attached to the Hamiltons' Statement of Claim as Exhibit D.

In any event, as the Hamiltons have also produced evidence that could arguably be challenged as hearsay,[6] the Court has considered Mulrooney's declaration to determine whether it could be considered "some evidence" to substantiate HTK's denial that the Hamiltons were customers of Tommy Fountain. Even ignoring the hearsay problem and assuming that Mulrooney's declaration would be admissible evidence, however, the Court concludes that it does not refute the Hamiltons' allegations that they were customers of Tommy Fountain when they purchased the ETS investments. The Hamiltons have stated in their sworn affidavit that Tommy Fountain personally came to their home, told them he was a broker with HTK, recommended that they invest in ETS investments, and assured them that ETS was a safe, conservative investment with a long history of proven success. Nothing in Mulrooney's declaration refutes that Tommy Fountain did any of that.

Although Mulrooney states that "Tommy said nothing" when Scott Fountain made telephone calls pitching phone in-

---

**5.** There is no "Exhibit A" attached to Mulrooney's Declaration in the record, but the document attached to the Hamiltons' Statement of Claim as Exhibit D is the same "newsletter" page referenced above that states: "Securities offered through Hornor, Townsend & Kent, 600 Dresher Road, Horsham, PA. Member NASD/SIPC." (Defs. Opp. to Pls. Mot. for Prelim. Inj. [9], Ex. 7.)

**6.** For example, the Hamiltons have produced what appears to be a letter purportedly from Tommy Fountain to "Mr. Sweeney," but the letter is unaccompanied by any affidavit from either Fountain or Sweeney, and it is not clear that this document would be admissible evidence in its current form. (*See* Defs. Supplemental Response to Pls. Mot. for Prelim. Inj. [27], Ex. 2.)

vestments, that does not mean that Tommy did not make personal home visits to the Hamiltons or other customers pitching ETS or other investment products. Mulrooney also states that "Tommy's name was not on any ETS paperwork and that, indeed, Tommy Fountain could not sign any ETS paperwork," but again, that does not mean that Tommy Fountain did not pitch the ETS investments, it does not mean that he did not make any profit from the sale of those investments, and it certainly does not mean that he did not participate in soliciting and selling those investments to the Hamiltons. In sum, nothing in Mulrooney's declaration refutes the Hamiltons' allegations that Tommy Fountain told them that he was a broker with HTK, and that he actively participated in selling the ETS investments to them.

As discussed above, the NASD Code does not provide a definition of "customer," but courts have uniformly applied very broad definitions of "customer" when determining whether claims fall within the scope of NASD Rule 10301. HTK argues that the Hamiltons were actually customers of Scott Fountain, not Tommy Fountain, but they have cited no authority for the proposition that only one person can be considered a "seller" of investments, or that investors can not be considered "customers" of more than one person. Moreover, even if Tommy Fountain's name were not on any of the paperwork involved with the ETS investments, and Scott Fountain signed every document that was provided to the Hamiltons in connection with their purchase of the ETS investments, the Hamiltons could still be considered customers of both Tommy and Scott if both Fountains actively participated in selling the ETS investments, and if they both profited from the sale. *Cf. Ehlert v. Singer*, 245 F.3d 1313, 1316 (11th Cir.2001)

(federal securities laws impose liability on those who transfer title to the security and those who successfully solicit the purchase) (citing *Pinter v. Dahl*, 486 U.S. 622, 642–46, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

The Hamiltons have not only alleged that they were customers of Tommy Fountain, they have also produced substantial evidence that Tommy Fountain held himself out as both a Vice President of The Fountain Financial Group, and as a broker with HTK. Furthermore, they have provided a sworn affidavit that Tommy Fountain personally came to their home and recommended that they invest in the ETS payphone investments. HTK has produced no evidence to refute these allegations, but instead, has merely denied that the Hamiltons were customers of Tommy Fountain. As the Eleventh Circuit has stated:

> A party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists. Rather, that party must substantiate the denial of the contract with enough evidence to make the denial colorable.

*Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851, 855 (11th Cir.1992); *see also Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.1995) ("it is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends. If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.").

The Court concludes that the Hamiltons have alleged sufficient facts and have produced sufficient evidence to establish that they were customers of Tommy Fountain,

and that HTK has failed to produce "some evidence" to substantiate their denial that the Hamiltons could be considered customers of Tommy Fountain. Furthermore, as one of the Hamiltons' primary claims against HTK is that it failed to supervise Tommy Fountain, there does not appear to be any question that the Hamiltons' claims arise "in connection with the business" of HTK or "in connection with the activities" of Tommy Fountain. *See Vestax Sec. Corp. v. McWood,* 280 F.3d 1078, 1082 (6th Cir.2002) ("A dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business"); *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 59 (2d Cir.2001) (same).

Thus, the Court concludes that the Hamiltons' claims fall within the scope of NASD Rule 10301, and HTK is required to submit to mandatory arbitration of these claims.

## IV. *Is HTK entitled to further discovery?*

■ As discussed at length above, when a party challenges the existence of an agreement to arbitrate, it is the obligation of the district court to determine whether an agreement existed. Under the FAA, when there is a genuine issue over the existence of the agreement to arbitrate, the "court shall proceed summarily to the trial thereof.... If no jury trial be demanded by the party alleged to be in default ... the court shall hear and determine such issue." 9 U.S.C. § 4.

In the instant action, HTK has not demanded a jury trial, but instead, seeks only to engage in further discovery on the issue of whether the Hamiltons were customers of Tommy Fountain. HTK argues that it is entitled to engage in limited discovery "for the sole purpose of confirming the identity of the individual who sold the ETS investments to the Hamiltons." (Pls. Motion for Prelim. Inj. [3] at 4.) Such an assertion assumes that there can only be one "individual" who sold the investments at issue to the Hamiltons, but HTK has not provided any authority that the law presumes only one "seller." Moreover, the Court has concluded above that the Hamiltons have presented sufficient evidence that they were customers of Tommy Fountain, regardless of whether they were also customers of Scott Fountain.

The Court notes that neither party has presented an affidavit from Tommy Fountain or Scott Fountain, and obviously their testimony could be crucial to the ultimate determination of the facts in this case. Nevertheless, the Court concludes that HTK is not entitled to engage in discovery in order to depose the Fountains, the Hamiltons, or any other potential witnesses. HTK filed this action November 5, 2001, and both parties have filed multiple motions and exhibits, and have had the opportunity to present affidavits and documentary evidence. Under Eleventh Circuit law, because HTK has not presented sufficient evidence to make their denial of the arbitration agreement "colorable," the Court must issue an Order compelling arbitration without further delay. *See, e.g., O.R. Sec., Inc. v. Prof'l Planning Assoc., Inc.,* 857 F.2d 742, 745 (11th Cir.1988) (district courts should handle arbitration matters by motion because the purpose of the FAA is to expedite judicial treatment of matters pertaining to arbitration); *see also Goldberg v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 650 F.Supp. 222, 228 (N.D.Ga.1986) (Ward, J.) ("a plaintiff should not be allowed to thwart arbitration in a 'garden variety securities fraud case' with a 'perfunctory' allegation of a nonar-

bitrable cause of action") (citing *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1215–16 (2d Cir.1972); *In re Oil Spill by the "Amoco Cadiz"*, 659 F.2d 789, 794 (7th Cir.1981)).

If a party opposing arbitration were able to issue a cursory denial of an arbitration agreement in order to be afforded an opportunity to conduct discovery in district court, it would frustrate the purpose of arbitration as a speedier alternative to litigation as a method of resolving disputes. In the instant action, the Hamiltons strongly oppose HTK's request for discovery, arguing that HTK merely seeks to use the federal discovery rules in order, to amass evidence for the arbitration, where extensive discovery is not allowed. The Court agrees that allowing discovery would not be proper under these circumstances. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n. 17, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *Penn Tanker Co. of Del. v. CHZ Rolimpex, Warszawa*, 199 F.Supp. 716 (S.D.N.Y.1961).

Furthermore, even if HTK were allowed to conduct discovery, and were able to amass evidence in support of its argument that Tommy Fountain was not involved in the sale of ETS investments to the Hamiltons, at best, the Court would be faced with the word of the Hamiltons against the word of the Fountains and would then be forced to address the same issue of arbitrability once again. Because HTK bears the burden of establishing that each claim asserted by the Hamiltons "clearly falls outside of the substantive scope of the agreement," however, in order to avoid arbitration of these claims, HTK must establish conclusively that the Hamiltons were *not* customers of Tommy Fountain. At most, HTK has shown an ambiguity over whether the Hamiltons fall within the

definition of "customers," but as all doubts and ambiguities should be resolved in favor of arbitration when construing the scope of arbitration agreements, further discovery on this issue would appear to be futile. *See e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Paine-Webber Inc. v. Hartmann*, 921 F.2d 507, 513 (3d Cir.1990).

Finally, if the Court were to allow further discovery, and were to involve itself further into an investigation of all the facts and circumstances surrounding the Hamiltons' purchase of the ETS investments, it would inevitably be encroaching on issues related to the merits of the Hamiltons' claims. Once the parties have developed a complete factual record in arbitration, HTK may very well be able to establish that Scott Fountain was the party primarily responsible for selling the ETS investments to the Hamiltons, and that Tommy Fountain did not misrepresent the true financial condition of ETS or otherwise mislead the Hamiltons into purchasing the ETS payphones. But those factual determinations are inextricably intertwined with the merits of the Hamiltons' claims and the ultimate liability of HTK, and thus, are the province of the arbitrators, not this Court. *See AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

Accordingly, on the basis of the record before the Court, it is "satisfied" that the Hamiltons' claims fall within the scope of NASD Rule 10301 and that the claims are subject to mandatory arbitration under the NASD Code. *See* 9 U.S.C. § 4 ("The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court

shall make an order directing the parties to proceed to arbitration . . . .").

## CONCLUSION

For the foregoing reasons, plaintiff's Motion for Preliminary Injunction [3] is **DENIED,** defendants' Motion for Protective Order to Preclude Discovery [8] is **GRANTED,** and defendants' Motion for Order Directing Arbitration [27] is **GRANTED.**

Because the Court's resolution of these motions disposes of this entire action, the action is **DISMISSED.**