GARRETT,. J.
| ,The defendant, UniFirst Corporation (“UniFirst”), appeals from a trial court judgment granting a preliminary injunction against arbitration in favor of the plaintiff, Fluid Disposal Specialties, Inc. (“Fluid”), and denying UniFirst’s exception of prematurity. For the following reasons, we affirm the trial court judgment.
INTRODUCTION
The narrow issues presented by this appeal are: (1) was the trial court correct in considering the issue of whether the person who signed an agreement was authorized to execute the document on behalf of Fluid instead of referring this issue to arbitration; and (2) assuming the trial court was correct in considering the issue, was the ruling made below on the authority issue .supported by the law and the evidence. Under the circumstances presented in this case, we answer both questions in the affirmative.
FACTUAL AND PROCEDURAL BACKGROUND
Fluid is a Louisiana corporation. It has locations in Homer and Minden, Louisiana, and in Marshall and Buffalo, Texas. Prior to this controversy, it had an agreement with Aramark to supply uniforms for its employees. The cost was approximately $750 per week, per location. UniFirst supplies , uniforms and other items to businesses. A UniFirst sales representative, Charlsa Henderson, contacted Kenny Bryce, the shop foreman at Fluid’s location in Homer, on numerous occasions about supplying uniforms. Bryce told her the uniforms had to be flame resistant and the price had to be close to the amount the company was spending with 1 ¡Aramark. Henderson eventually gave Bryce a quote of $751.70 per week for uniforms which were represented to be better quality than those supplied by Aramark. On April 3, 2014, Bryce signed his name on a form customer service agreement presented by Henderson. The printed form agreement contained an arbitration clause on the reverse side along with numerous other provisions in fine print. Bryce and Henderson initialed some changes on the back side of the form agreement, shortening the preprinted term from 60 to 36 months.. UniFirst eventually began supplying uniforms and other items to.Fluid.
Rather than costing approximately $3,000 per week for uniforms for all four locations, the charges were approximately $4,888 per week. At some point, Fluid objected to the cost and officials of Fluid entqred into unproductive discussions with representatives of UniFirst. Fluid maintained that Bryce did not have the-authority to execute the agreement on behalf of the company and that Fluid was not obligated under the agreement. At some *213 point, Fluid began using another uniform supplier.
On November 25, 2014, counsel for Uni-First wrote a demand letter to Fluid claiming more than $809,000 in damages due to Fluid’s alleged breach of the agreement.[1] Fluid obviously did not pay the amount demanded. UniFirst then initiated arbitration proceedings, based upon the arbitration clause on the back of the customer service agreement, which provided in pertinent part:
| a All disputes of whatever kind between Customer and UniFirst based upon past, present, or future acts, whether known or unknown, and arising out of or relating to the negotiation, formation or performance of this Agreement shall be resolved exclusively by final and binding arbitration. The arbitration shall- be conducted in the capital city of the state where Customer has its principal place of business (or some other location mutually agreed to by Customer and Uni-First) pursuant to the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association and shall be governed by the Federal Arbitration Act.
On January 26, 2015, Fluid and Bryce filed the instant suit in state district court against UniFirst for a declaratory judgment, as well as preliminary' and permanent injunctive relief barring arbitration.[2] Fluid claimed that Bryce did not have authority to sign the agreement on behalf of the company, therefore, the contract was not valid under Louisiana law and the arbitration clause was not enforceable.
UniFirst countered with an exception of prematurity and a demand for arbitration. On March 11, 2015, the trial court held an evidentiary hearing on'both the plaintiffs’ request for a preliminary injunction and the defendant’s exception. Without any objection by either side, the trial court heard testimony from numerous witnesses, and numerous exhibits were introduced.
Mike Hays, the president of Fluid, testified that Bryce is the dispatcher and shop foreman at the Homer location! Hays was aWare that Bryce had’beén talking to other uniform suppliers, but Bryce did not have authority to sign contracts for the company. The persons authorized to 14execute documents on behalf of the company were Hays and the'Chief Financial Officer (“CFO”), Timothy Brown. Hays said he was not aware that Bryce had signed the agreement sought to be enforced until well after April 2014, when the dispute arose.
Bryce testified that Fluid’s old uniforms were getting faded and he talked to Hays about getting new ones." Hays said Bryce could “look' into it”' if the price was the same or cheaper. Bryce said he showed Henderson the Aramark bill and she said she could get uniforms for around the same price. She quoted $751.70 per week for the Hdrner location and said the company could get out of any agreement after $0 days if Fluid was not satisfied. He stated that he did riot talk to anyone else at Fluid before he signed the document *214 presented by UniFirst. Bryce put the document in a drawer. Bryce stated that he did not realize.it was a long-term contract and he did not have authority to sign such an agreement on behalf of . Fluid. Henderson returned the next day with, another agreement which added the Buffalo location and Bryce also initialed it. Henderson gave Bryce a credit application and he passed it on to Brown.
Brown testified that he had been the CFO at Fluid for 15 years. He knew Bryce was talking to companies about uniforms, but did not know until well after the fact that Bryce,, signed an agreement. Brown testified that the company purchased many, things without contracts on an “occurrence by occurrence basis.” According to Brown, Bryce did not have authority to execute a contract on behalf of Fluid. Brown was questioned about the | Bcredit application from UniFirst. He said he did not recall who gave him the application to fill out.
The testimony of Charlsa Henderson, the UniFirst sales representative, differed in many respects from that given by Hays and Bryce. She testified that, for four to five months, she discussed with Bryce the possibility of Fluid leasing uniforms from her company. Bryce gave her a business card, stating his job title as “transportation logistics.” According to Henderson, Bryce told her he was the decision maker. She first claimed that she never saw Fluid’s invoices from Aramark, but later said she did see the Aramark paperwork and told Bryce her company could provide uniforms for approximately the same price. She assumed that Fluid’s contract with Aramark was signed by Bryce’s predecessor.
Henderson gave Bryce a quote of $751.70 per week for uniforms for the Homer location. On April 3, 2014, she and Bryce signed the customer service agreement and initialed changes to the standard agreement to provide for a term of 36 rather than 60 months. Henderson acknowledged that the customer service agreement did not contain the number of uniforms to be rented. She stated that Bryce told her they needed, to add the location in Buffalo, Texas, so she took another copy of the customer service agreement to him on April 4, and they both signed that agreement.
Henderson admitted she told Bryce that Fluid could get out of the contract with 30 days’ notice. Henderson claimed' that Bryce said he had to go to the next room to get approval from Hays before he signed the agreement. She claimed Bryce walked out of the room and then returned in |fia few minutes. Henderson testified that she saw Hays at the Homer location on that day. However, in his testimony, Hays said that he was working from his home in Simsboro on the day the disputed agreement was signed by Bryce and Henderson. He denied being in Homer. As proof, of this point, he offered into evidence his cell phone records showing he made calls from Simsboro when Henderson claimed she saw him in Homer. Bryce also corroborated the testimony that Hays was not at the Homer location at the time claimed by Henderson.
Tommy White, the Bossier branch manager for UniFirst, testified that in order to supply uniforms to Fluid, the company purchased 2,034 shirts at a cost of $97.37 per shirt and 2,042 pairs of pants at $87.98 per pair. The average weekly rental rate for Fluid’s four locations was $4,888.53. White .acknowledged that the number of uniforms to be leased was not included in the agreement signed by Bryce.
The first issue presented to the trial court was whether the court or the arbitrator should decide whether there was a valid written contract between the parties *215 requiring arbitration. The trial court determined that it should decide this issue. After hearing the testimony and evidence recounted above, the court concluded that Bryce did not have the authority to commit Fluid to the written contract sought to be enforced by UniFirst, and thus there was no binding arbitration agreement. The narrowly tailored judgment signed by the trial court provided as follows:
IT IS HEREBY ORDERED that the plaintiffs’ petition for preliminary injunction to enjoin arbitration is hereby GRANTED for the reasons stated orally in open court and that |7any further arbitration proceedings are hereby enjoined pending further orders of this court to the contrary.
IT IS HEREBY FURTHER ORDERED that defendant’s Dilatory Exception of Prematurity is DENIED for the reasons orally stated in open court.
UniFirst appealed. It did not make assignments of error in this case.. The arguments we address are extrapolated from its brief.
ARBITRATOR ÓR DISTRICT COURT
UniFirst claims that, under the broadly written arbitration clause in the agreement, the arbitrator and not the trial court must decide whether the agreement is valid. UniFirst notes that the arbitration clause specifies:
All disputes of whatever kind between Customer and UniFirst based upon past, present, or future acts, whether, known or unknown, and arising out of or relating to the negotiation, formation or performance of this Agreement shall be resolved exclusively by final and binding arbitration. [Emphasis supplied.]
UniFirst maintains that this clause is inclusive of disputes concerning the formation of the agreement, which makes this matter distinguishable from other cases decided by this court in which the arbitration clause was more narrowly written. Based upon our review of the jurisprudence pertaining to similar cases, this argument is'without merit. - > •
Discussion
Fluid sought a preliminary injunction enjoining arbitration. La. C.C.P. art. 3601 provides in pertinent part:
An injunction shall be issued in cases where irreparable injury, loss, or dam-agb may otherwise result to the applicant[.]
Generally, a party seeking issuance of a preliminary injunction bears the burden of establishing By a preponderance of the evidence a prima facie | «showing that he will prevail on the merits and that irreparable injury or loss will result without the preliminary injunction. The trial court enjoys considerable discretion in determining whether a preliminary injunction is warranted; thus, the trial court’s ruling will not be disturbed on appeal absent a clear abuse of discretion. Tobin v. Jindal, 2011-0838 (La.App. 1st Cir.2/10/12), 91 So.3d 317.[3]
In the present case, Unifirst filed an exception of prematurity, contending that the matter should go.to arbitration. When the issue of a party’s failure to arbitrate is raised through a dilatory exception of prematurity, the exceptor has the burden of showing a valid contract to arbitrate. Johnson’s, Inc, v. GERS, Inc., 34,268 (La.App.2d Cir.1/24/01), 778 So.2d *216 740; Broussard v. CompuLink Bus. Sys., Ino., 41,276 (La.App.2d Cir.8/23/06), 939 So.2d 506. In determining whether a party is bound by an arbitration agreement, we apply ordinary contract principles. A party cannot be required to submit to arbitration any dispute which he has not agreed to so submit. Horseshoe Entm’t v. Lepinski, 40,753 (La.App.2d Cir.3/08/06), 923 So.2d 929, writ denied, 2006-0792 (La.6/02/06), 929 So.2d 1259; Broussard v. CompuLink Bus. Sys., Inc., supra.
Louisiana has adopted a policy favoring arbitration. Aguillard v. Auction Mgmt. Corp., 2004-2804 (La.6/29/05), 908 So.2d 1; Broussard v. CompuLink Bus. Sys., Inc., supra. The Louisiana Arbitration Act (“LAA”) is found in La. R.S. 9:4201-4217. La. R.S. 9:4201 provides:
A provision in any written contract to settle by' arbitration a controversy thereafter arising out of the contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
La. R.S. 9:4203 specifies in pertinent part:
A. The party aggrieved by the alleged failure or refusal of another to perform under a written agreement for arbitration, may petition any court of record having jurisdiction of the parties,' 'or of the property, for an order directing that the arbitration proceed in the manner provided for in the agreement. Five days’ written notice of the application shall be served upon the party in default. Service shall be made in the manner provided by law for the service of a summons.
B. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue, the court shall issue an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the arbitration agreement or the failure or refusal to perform is an issue, the court shall proceed summarily to the trial thereof.
The Federal Arbitration Act (“FAA”) is contained in 9, U.S.C. §§ 1-16. Louisiana courts look to federal law in interpreting the LAA,because it is very similar to the FAA. Marsh Farms v. Olvey, 42,889 (La.App.2d Cir.1/9/08), 974 So.2d 194. In construing the FAA, the Supreme Court has held that the federal court may consider only issues relating to the making and performance of the agreement to arbitrate. Prima Paint Corp. v. Flood & Conldin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Both federal and Louisiana jurisprudence provides that the issue of |inthe existence of an agreement to arbitrate is to be decided by the courts. In Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), the parties signed a contract containing an arbitration clause, but the respondents claimed the agreement was not valid because it was usurious. Buckeye moved to compel arbitration. The Supreme Court considered whether the validity of a contract containing an arbitration clause should be decided by the court or by an arbitrator. The Supreme Court held that a challenge to the validity of a contract, as a whole, and not specifically to the arbitration clause within it, must go to the arbitrator, not the court. However, the Supreme Court expressly noted in a footnote that the issue of a contract’s validity is different from the *217 issue of whether any agreement at all existed between the alleged obligor and the obligee. The Court stated it was not.considering cases including those holding that courts should decide whether the signor lacked authority to commit the alleged principal. This statement by the Supreme Court, as well as other federal and state jurisprudence, indicates that in such a situation, there would be no agreement at all between the parties, including an agreement to arbitrate and the issue of the existence of the agreement would be decided by the court.
In Will-Drill Res., Inc. v. Samson Res. Co., 352 F.Sd 211 (5th Cir.2003), the Fifth Circuit held that the issue of whether any agreement to arbitrate existed is to be decided by the courts, based upon state law contract formation principles. The Third Circuit, in Sandvik AB v. Advent Int’l Corp., 220 F.3d 99 (3d Cir.2000), addressed the issue of whether the court |nor the arbitrator should decide the issue of the very existence of a contract containing an arbitration clause when one of the parties claimed the person who signed the agreement lacked authority to do so. The Third Circuit concluded that the court was the proper forum to determine this issue, finding that there may be no arbitration if the agreement to arbitrate is nonexistent. Also, in Sphere Drake Ins. Ltd. v. All Am. Ins. Co., 256 F.3d 587 (7th. Cir.2001), the Seventh . Circuit concluded that, where a party argues that the signature on a. contract was made by a faithless agent who lacked authority to make the commitment, there is-an issue as to whether there is any contract at all. The. Seventh Circuit noted that many federal appellate courts have held that the judiciary, rather than the arbitrator, decides whether a contract came into being. See also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., 925 F.2d 1136 (9th Cir.1991)..
In Sinners & Saints, L.L.C. v. Noire Blanc Films, L.L.C., 937 F.Supp.2d 835 (E.D.La.2013), the court considered a claim by one of the parties to the suit that it was not bound by an agreement containing an arbitration clause because its agent acted outside the scope of his authority in signing,it. The court held that, in order to determine whether parties should be compelled to arbitrate a dispute, courts perform a two-step inquiry. First, the court must determine whether the parties agreed to arbitrate the dispute. In making this inquiry, the court must determine: (1) whether there is a valid agreement to arbitrate between the parties, and (2) whether the dispute in question falls within the scope of that arbitration agreement. Sinners & Saints, L.L.C. v. Noire Blanc Films, L.L.C., supra; BMA Fin. Servs., Inc. v. Guin, 164 F.Supp.2d 813 (W.D.La.2001); Marsh Farms v. Olvey, supra; Saavedra v. Dealmaker Devs., LLC, 2008-1239 (La.App. 4th Cir.3/18/09), 8 So.3d 758, writ denied, 2009-0875 (La.6/5/09), 9 So.3d 871; Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc., 2003-1662 (La.App. 4th Cir.3/17/04), 871 So.2d 380, writs denied, 2004-0969, 2004-0972 (La.6/25/04), 876 So.2d 834.
Here, Fluid contends that UniFirst does not have a valid and enforceable written contract with it because the agreement was signed by an employee without any legal authority to bind the company. Essentially, Fluid argues that it was never a party to the agreement UniFirst seeks to enforce. The trial court properly found that it had the power to decide whether there was an agreement to arbitrate, rather than requiring that this issue be determined by an arbitrator. This decision was in accord with the jurisprudence discussed above, holding that the court is the proper forum to decide this issue when the ques *218 tion of authority to bind the corporation is being urged.'
We also observe that UniFirst did not lodge any objection below to the trial court’s actions in conducting a lengthy evi-dentiary hearing on this issue. Notably, both sides called witnesses and introduced exhibits. At this juncture, we have a fully developed record on the authority issue. It would be completely counterproductive to vacate the decision by the .trial court and refer this issue to an arbitrator.
|13APPABENT AUTHORITY
Unifírst next contends that the trial court erred in failing to find that Bryce had apparent authority to enter into the agreement and that Fluid is bound by all terms of the written agreement. This argument is without merit.
Discussion
In the past, Louisiana courts juris-prudentially recognized the doctrine of apparent authority. See Walton Const. Co. v. G.M. Horne & Co., 2007-0145 (La.App. 1st Cir.2/20/08), 984 So.2d 827. Apparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent. Tedesco v. Gentry Dev., Inc., 540 So.2d 960 (La.1989); Walton Const. Co. v. G.M. Horne & Co., supra. See also American Zurich Ins. Co. v. Johnson, 87,567 (La.App.2d Cir.7/30/03), 850 So.2d 1112; Kobuszewski v. Scriber, 518 So.2d 524 (La. App. 2d Cir.1987). In 1997, the legislature enacted La. C.C. art. 3021 to specifically address the liability of a principal that arises out of his agent’s purporting to act on the principal’s behalf. Acts 1997; No. 261, § 1, effective Jan. 1, 1998; Walton Const. Co. v. G.M. Horne & Co., supra. That article provides:
One who causes a third person to believe that another person is his mandatary is bound to the third person who in good faith contracts with the putative manda-tary.
luThe courts have continued to apply the pre-La. C.C. art. 3021 jurisprudence on the doctrine of apparent authority. See Walton Const. Co. v. G.M. Home & Co., supra. Apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this. Tedesco v. Gentry Dev., Inc., supra. Louisiana courts have utilized the doctrine of apparent authority-to protect third persdns by treating a principal who has manifested an agent’s authority to third persons as if the principal had*- actually granted the aúthority to the agent. Tedesco v. Gentry Dev., Inc., supra. In the absence of contact between the putative principal and the third party, there is no manifestation and, a fortiori, no apparent authority. American Zurich Ins. Co. v. Johnson, supra.
An agency relationship is never presumed; it must be clearly established. Broussard v. CompuLink Bus. Sys., Inc., supra. The burden of proving apparent authority is on the party seeking to bind the principal.' A third party may not blindly rely on the assertions of an agent, but has- a duty to determine, at his peril, whether the agency purportedly granted by the principal-permits the proposed act by the^ agent. One must look from the viewpoint of the third party to determine whether an -apparent agency has been created. Bamburg Steel Bldgs., Inc. v. Lawrence Gen. Corp., 36,005 (La. App.2d Cir.5/8/02), 817 So.2d 427. See *219 also Marinebanc Leasing Co. v. Allied Cos. of La., Inc., 535 So.2d 796 (La.App. 2d Cir.1988).
A trial court’s determination of an agency relationship is essentially a factual matter. Therefore, our review of the trial court’s factual findings is |1Kgovemed by the manifest error standard of review. Under this standard, the reviewing court may reverse only if it finds that no reasonable factual bases exist for the findings of the trial court which are clearly wrong or manifestly erroneous. Bamburg Steel Bldgs., Inc. v. Lawrence Gen. Corp., supra.
We note at the outset that Fluid is a corporation and was listed as such on the upper portion of the document filled out by Henderson. She was fully aware that Hays was the president of Fluid. The document does not show that Bryce signed as a representative of the corporation; he merely signed his name on a signature line.
Henderson stated that she talked with Bryce for several months about securing an agreement to supply uniforms. Bryce had a business card which stated' his job title as “transportation logistics.” ’ He testified that, in addition to being the shop foreman for the Homer location, he was also a dispatcher for Fluid. There is nothing inherent in either of these positions that would lead a third party to believe that Bryce had authority to enter into an expensive and long-term agreement on behalf of Fluid. It was Bryce alone who had contact with Henderson. Her testimony that he led her to believe that he had authority to make an agreement to rent uniforms is belied by her later testimony that he got approval from Hays before he signed. The corporate officers of Fluid who had authority to bind the company never had any contact with Henderson and never made any manifestations to her that Bryce had authority to sign an agreement on behalf of the company. Henderson blindly relied upon her beliefs and she and her supervisors failed to fulfill their duty to determine whether the agency purportedly granted by |1Rthe principal permitted the act by Bryce. We cannot help but note that Henderson herself had to get the written approval of her branch manager, Tommy White, who approved the agreement. We- agree with the conclusion by the trial court that1 Bryce did not have either actual or apparent authority to execute the agreement on behalf of Fluid. Sin'ce there is no valid written agreement compelling arbitration, the trial court’s rulings on the narrow issues before it are correct.
We note that the provisions of the narrowly tailored judgment signed by the trial court, quoted above, do not in any way preclude UniFirst from instituting appropriate legal action against Fluid or Bryce for any obligations or damages that may have arisen from Fluid’s utilization of uniforms and other items supplied by Uni-First. Indeed, the trial court very astutely stated on the record at the hearing on the injunction, and exception:
I think the relevant issue for this Court ... maybe later on down the road about how much money somebody may or may not owe based on other trials, that some of this may be relevant as to whether or not somebody owes $809,000 or they owe $15. But, right now the issue is whether or not Mr. Bryce had authority to bind Fluid Disposal to any contract, but more importantly this one.
, CONCLUSION
For the reasons stated above, we affirm the trial court judgment granting a preliminary injunction in favor of Fluid and denying the exception of prematurity by Uni- *220 First. Costs in this court are assessed to UniFirst.
AFFIRMED.

. UniFirst claimed it was owed $488,374.49 in garment costs; $254,203.56 for unexpired weeks in the agreement; $66,702.68 in accounts receivable for a total of $809,280.73. Some of the items claimed were based upon a liquidated damages provision • contained on the reverse side of the printed document.

. In addition to argúing that Bryc'e did not have authority to enter into any contracts on behalf of the company, Fluid also contended the document signed by Bryce was merely a price list which did not have a total of the uniforms to be rented. Therefore, the parties ■ did not have a meeting of. the minds on the price, and there was no contract.

. We note that La. C.C.P. art. 3612(B) specifies:
An appeal may be taken as a matter of right from an order or judgment relating to a preliminary or final injunction, but such an order or judgment shall not be suspended during the pendency of an appeal unless the court in its discretion so orders.