Judgment rendered April 5, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,275-CA
No. 54,276-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SERVICE FIRST, INC.                          Plaintiff-Appellant

versus

TIMOTHY D. PLUMLEY                           Defendant-Appellee

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court Nos. 2019-2075 and 2019-2179

Honorable Daniel Joseph Ellender, Judge

* * * * *

ROUNTREE LAW OFFICES                         Counsel for Appellant
By: James A. Rountree

LAW OFFICES OF J. DHU
THOMPSON, APLC                               Counsel for Appellee
By: J. Dhu Thompson
    Taylor Elaina Hipp

* * * * *

Before THOMPSON, ROBINSON,
and O'CALLAGHAN (*Pro Tempore*), JJ.

**ROBINSON, J.**

Service First, Inc. ("Service First") appeals a judgment denying its claim to recover money that it allegedly loaned to an employee, Timothy Plumley ("Plumley"), who had been injured in a vehicular accident that was non-work-related. We affirm the judgment.

## FACTS

Timothy Plumley began working for Service First as a service technician in 2011. Service First is located in West Monroe, Louisiana. Plumley was an hourly employee whose areas of expertise were HVAC and commercial refrigeration. Plumley's job title later changed to service manager, with his job duties including taking phone calls from Service First technicians seeking advice. He became a salaried employee in 2015.

On May 31, 2016, Plumley was severely injured when an ambulance transporting him from Rayville Hospital to St. Francis Medical Center in Monroe was involved in an accident.

On June 3, 2016, Plumley signed an agreement with Service First, which was managed by Harry Vowles ("Vowles") at the time. The agreement stated:

> I, Timothy Plumley, hereby agree that out of the proceeds of settlement or judgment resulting from my accident of May 31, 2016, G. Scott Moore shall retain money owed to Service First, Inc. due to Service First, Inc. continuing to pay my wages as a loan until such time as I am released by my physician to return to work.

> I further agree to sign any documentation necessary should Service First, Inc. be required to perfect a lien against said proceeds.

Plumley was discharged from the hospital in June. He claimed that he resumed his work duties after a couple of months as he began receiving phone calls at home related to technical support. The extent of work performed by Plumley over the next three years was disputed by Service First.

Mike Bellissimo was the owner of Service First at the time. In November of 2016, he returned to Louisiana from Tennessee to straighten out Service First, which had fallen on hard financial times. He fired Vowles at the beginning of 2017 and placed Jeffrey Alford ("Alford") in charge of finances. Plumley told Alford, who was unaware of the agreement, that he would repay Service First when his lawsuit was settled.

Damon Kervin ("Kervin") represented Plumley in his personal injury lawsuit. On August 27, 2018, the legal assistant for Kervin emailed her employer that Heath Hattaway ("Hattaway"), who represented Service First, advised Kervin that he was no longer to speak with any employee of Service First except for Plumley.

Shortly thereafter, Hattaway and Kervin began discussing the agreement between Plumley and Service First. On September 19, 2018, Hattaway emailed to Kervin, "It's my understanding we ARE seeking this reimbursement. I will confirm."

On September 26, 2018, Kervin emailed Hattaway, "Good afternoon, Heath. I am circling back on this." The next day, Hattaway emailed Kervin, "Yes. We want the reimbursement." Kervin replied later that day asking Hattaway to provide the amount. Hattaway responded that he had scheduled a meeting with their CPA to determine that amount. There were other

emails that day concerning the release of depositions given by Mike Bellissimo and Alford in Plumley's lawsuit.

On October 4, 2018, Kervin emailed Hattaway:

Thank you for speaking with me today, Heath. Please confirm in writing that Service First, Inc., is not pursuing any lien/payment per the attached document. Thank you, Damon.

Later that day, Hattaway replied in an email that was copied to Mike Bellissimo:

Hi Damon:

I've spoken with my client, Mike Bellissimo, Present [*sic*] of Service First, Inc.

He has instructed me to relay to you at [*sic*] Service First, Inc. will not be pursuing any lien/payment from your client.

Please let me know if there is any additional information you need from me.

Best,
HH

On October 15, 2018, Plumley settled his personal injury lawsuit. Plumley sent an email to Alford and several other Service First employees that he was resigning his position effective October 26, 2018. Nevertheless, he continued working. He told Amanda Madden, Mike Bellissimo's secretary, about the settlement.

Plumley was terminated on June 7, 2019. From May 31, 2016, until that date, Plumley was paid $159,107.60 in net pay after deductions for taxes, Medicare, and Social Security.

Service First filed a petition for injunctive relief on June 28, 2019, to prohibit Plumley from soliciting Service First's employees or clients.

On July 10, 2019, Service First filed suit against Plumley to recover the $208,544.88 in gross earnings that it had paid to Plumley since his

3

accident. Service First also claimed that Plumley failed to inform it that he had settled his lawsuit, and, thus, he fraudulently continued to collect money. In his answer, Plumley raised as an affirmative defense that the relief sought against him was barred on the basis of the doctrines of "equitable estoppel, judicial estoppel, waiver, laches, and/or unclean hands."

On September 10, 2019, the trial court entered an order consolidating the lawsuits.

### Trial on the merits

A bench trial was held in this matter on March 10, 2021. Counsel for Service First objected to examination concerning the email sent by Hattaway to Kervin regarding the waiver on the grounds that it was an attempt to expand the scope of the pleadings. Plumley's counsel countered that waiver had been raised as an affirmative defense. Counsel for Service First responded that extinguishment of debt had not been specifically pled. Two days prior to trial, Service First had filed a written objection to an expansion of the pleadings on the grounds that the affirmative defense of extinguishment of an obligation was not pled under La. C.C.P. art. 1005 and was being raised for the first time in Plumley's pretrial statement. The trial court allowed the questions on the grounds that the general waiver language in the answer was sufficient to give notice to Service First that waiver could be an issue at trial.

Alford testified that he first became familiar with the agreement in December of 2016 when Plumley brought it to his attention. Alford did not think that Plumley did any work for at least a year, and he never fully came back to work. According to Alford, Plumley came to the office and drank coffee for a couple of hours a day, answered a few phone calls, and went to

4

job sites of his own volition. Plumley did this despite never providing a full release to return to work. In evidence is a May 7, 2019, letter from Plumley's physician advising that he extended Plumley's previous limitations for another four weeks.

Alford testified that Heath Hattaway was Service First's attorney from 2017 until January of 2019. Alford would meet with Hattaway to discuss matters related to Service First. Hattaway also represented Service First in a lawsuit brought against Vowles. Alford testified that he did not authorize Hattaway to send the email to Kervin releasing the debt, and as far as he knew, it had not been authorized by Mike Bellissimo.

Tammy Johnson became Service First's office manager in 2018. Prior to that, she had worked as its dispatcher. She thought Plumley was on medical leave for two years and did not work, although he occasionally took phone calls from technicians. She testified that Plumley told Amanda Madden about his lawsuit being settled and showed his bank statement to Madden.

Plumley testified that his job role converted to being a consultant a few months after the accident. He claimed that he handled accounts receivable, advised technicians over the phone, and occasionally went on troubleshooting calls to job sites with technicians. Many of his tasks could be performed from the office or from his home. He testified that he was never told that he had to work a set number of hours to earn his salary. Plumley was able to continue working despite not being released to return to work by his physician.

Plumley testified that he told Madden about the settlement so she could inform Mike Bellissimo about it. He also testified that he never

stopped working and actually earned his salary. He claimed that the emails and photos documenting much of the work he performed were deleted from his personal phone by Service First's IT person.

Margaret Danna Bellissimo, the daughter of Mike Bellissimo, took over Service First's payroll and accounting in February of 2017. In her opinion, Plumley did very little work for Service First following the accident. She believed that Plumley owed the entirety of his salary that he was paid from May of 2016 until he was terminated in June of 2019.

Mike Bellissimo ("Bellissimo") testified that the first time he learned of the agreement was when he gave a deposition in Plumley's lawsuit. Bellissimo recalled that he later received a phone call from Hattaway, who was angry that Bellissimo and Alford had given a deposition without his knowledge. He testified that during this conversation:

> [Hattaway] told me that he could not tell me who he was talking to, that he could not tell me the particulars of what they had talked about, but he knew that there was a settlement on the table for Mr. Plumley and that the only thing standing in the way of it was a supposedly [*sic*] debt to Service First. And he asked me what I thought. I said, well, I did not make any agreement with Mr. Plumley, with Service First, and I cannot forgive something I didn't do.

Bellissimo denied that he ever forgave any indebtedness owed by Plumley under the terms of the agreement. He also denied that he authorized Hattaway to email or to tell Kervin that Service First had forgiven the debt. He explained that he would have emailed Alford if that had been done because a decision of that magnitude was outside of his involvement in Service First at that time and he was already back in Tennessee. If there was a decision to be made, he would have consulted with Alford.

6

Bellissimo agreed that Hattaway was his corporate lawyer who handled the lawsuit against Vowles. He testified that he told Alford to discharge Hattaway because he was not serving the purpose of Service First. According to Bellissimo, Hattaway made a lot of decisions on his own without Bellissimo's knowledge and permission.

Kervin testified that Hattaway came into the picture when he contacted Kervin's office, identified himself as Service First's corporate attorney, and instructed Kervin not to have any further contact with Service First. When the attorneys spoke next, Hattaway said that Service First wanted the entire amount owed. He also asked Kervin for the depositions of Alford, Bellissimo, and Plumley.

Kervin explained that the purpose of the phone conversation with Hattaway was to determine whether Plumley owed money to Service First. He recalled that Hattaway said he would look into it after reviewing the depositions. Hattaway later called him and said Service First was not seeking reimbursement. Kervin told Hattaway to confirm in writing that they were waiving the lien, and Hattaway sent the email confirming that no amount was owed.

### Judgment

In its oral reasons for judgment, the trial court concluded that Hattaway was the corporate counsel for Service First and had permission from Service First to release the obligation. The court noted that Bellissimo testified that he did not tell Hattaway that Service First was not pursuing the amount allegedly owed to it. While the trial court found Bellissimo to be generally credible, it did not find him to be credible on this point. The court particularly noted that Bellissimo had been copied on the email from

7

Hattaway to Kervin. The court also considered that the release of the debt was not inconsistent with the evidence that Plumley did perform some work for the three years in question. In conclusion, the court ruled that Service First had not carried its burden of proof and denied the claim.

On March 19, 2021, the court rendered judgment denying Service First's petition because it had failed to meet its burden of proof. The petition for injunctive relief was dismissed as moot. Service First appealed.

## DISCUSSION

In its sole assignment of error, Service First maintains that the trial court erroneously concluded that Service First released Plumley from his obligation to repay Service First as Hattaway lacked this authority. Service First argues that Plumley never abided by his agreement to repay Service First when his personal injury lawsuit was settled.

Service First contends that Hattaway's October 4 email did not clearly state it was a remission of debt. Service First adds that Kervin's email on that same date had an attached document, and without that document, one cannot put Hattaway's response in its proper context. Service First further argues that Hattaway lacked authorization to release the debt, and the only evidence of communication between Bellissimo and Hattaway was the conversation in which Hattaway said he had information about a possible settlement.

Service First maintains that Plumley did not bear his burden of proving that he should not be required to repay Service First because he earned the money. It notes that Plumley claimed that he had witnesses who could corroborate his work, but did not subpoena them. Further, his claim

8

that emails and photos on his phone were swiped clean by Service First's IT person is fantastic.

Service First asserts that Plumley could have subpoenaed Hattaway in support of his remission of debt defense, which triggers the uncalled witness rule. Service First maintains that Hattaway had peculiar knowledge of material facts, and the court should consider Plumley's failure to call him as an admission that Hattaway's testimony would not have been favorable to Plumley. Service First asserts that it had no reason to subpoena Hattaway because the affirmative defense was not disclosed in pleadings and Plumley had the burden of proof on the remission defense.

Service First also requests that this court take into consideration that Mike Bellissimo returned to Louisiana in late 2016 because Service First was near financial ruin, he did not become aware of the agreement until late 2018, and it is inconceivable that he would forgo more than $200,000 owed by Plumley, who was going to settle his lawsuit for a significant sum of money.

A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship. La. C.C. art. 3071. A compromise shall be made in writing or recited in open court. La. C.C. art. 3072.

Authority must be given expressly to make remission of a debt. La. C.C. art. 2997. The requirement of a written document to perfect a compromise is not satisfied by the signature of a party's attorney alone, unless authorization is expressly given. *Chiasson v. Progressive Security Ins. Co.*, 12-532 (La. App. 5 Cir. 2/21/13), 110 So. 3d 1147.

La. C.C. art. 3021 states, "One who causes a third person to believe that another person is his mandatary is bound to the third person who in good faith contracts with the putative mandatary."

Apparent authority is an estoppel principle which operates in favor of third persons seeking to bind a principal for unauthorized acts of an agent. *Independent Fire Ins. Co. v. Able Moving and Storage Co., Inc.*, 94-1982 (La. 2/20/95), 650 So. 2d 750. When the apparent scope of an agent's authority, the indicia of authority, is relied upon by innocent third parties to their detriment, the principal is liable. *Id.*

This principle was discussed in depth by this court in *Fluid Disposal Specialties, Inc. v. Unifirst Corp.*, 50,356 (La. App. 2 Cir. 1/13/16), pp. 13-15, 186 So. 3d 210, 218-219:

> In the past, Louisiana courts jurisprudentially recognized the doctrine of apparent authority. Apparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent. In 1997, the legislature enacted La. C.C. art. 3021 to specifically address the liability of a principal that arises out of his agent's purporting to act on the principal's behalf….

> The courts have continued to apply the pre-La. C.C. art. 3021 jurisprudence on the doctrine of apparent authority. Apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this. Louisiana courts have utilized the doctrine of apparent authority to protect third persons by treating a principal who has manifested an agent's authority to third persons as if the principal had actually granted the authority to the agent. In the absence of contact between the putative principal and the third party, there is no manifestation and, *a fortiori*, no apparent authority.

> An agency relationship is never presumed; it must be clearly established. The burden of proving apparent authority is on the party seeking to bind the principal. A third party may not

10

blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purportedly granted by the principal permits the proposed act by the agent. One must look from the viewpoint of the third party to determine whether an apparent agency has been created.

A trial court's determination of an agency relationship is essentially a factual matter. Therefore, our review of the trial court's factual findings is governed by the manifest error standard of review. Under this standard, the reviewing court may reverse only if it finds that no reasonable factual bases exist for the findings of the trial court which are clearly wrong or manifestly erroneous.

Citations and article omitted.

The authority of an attorney to settle a lawsuit was at issue in *Elder v. Elder & Elder Enterprises, Ltd.*, 2006-0703 (La. App. 4 Cir. 1/11/07), 948 So. 2d 348, *writ denied*, 07-0560 (La. 5/4/07), 956 So. 2d 616. In that matter, the defendants filed a motion to enforce a settlement after the plaintiff's counsel advised defendants that his client had accepted a counteroffer. Discussing the authority required of attorneys when settling a matter, the appellate court stated:

Requiring attorneys to secure the express and written consent of their clients as buyers and/or sellers in all settlements that include the transfer of immovable property is too onerous of a requirement in cases where the nature of the dispute itself does not involve immovable property. Such a requirement would only serve to impede settlements and thereby weaken our jurisprudential practice of encouraging judicial settlement of on-going litigation.

*Id.*, 2006-0703 at p. 7, 948 So. 2d at 352.

The above language was cited with approval by the court in *Chiasson v. Progressive Security Ins. Co.*, *supra*. In that matter, Progressive's attorney sent a letter to the plaintiff's attorney setting forth the settlement terms. Progressive filed a motion to enforce a settlement after the plaintiff's attorney signed the letter above the notation, "On Behalf of and with the

11

Consent of Percy Chiasson." Upholding the trial court's judgment enforcing the motion, the appellate court agreed with Progressive's position that it would place a great burden on the system if an opposing party could not rely on the written assertions of counsel that he has the authority of his client to enter into an agreement.

Hattaway was Service First's corporate counsel in October of 2018. He had earlier represented Service First in its lawsuit against another former employee, Vowles. Hattaway initially communicated to Kervin that it was his understanding that Service First was seeking reimbursement, which he would confirm. A week later, he emailed Kervin that Service First wanted the reimbursement.

When Hattaway told Kervin in a later phone conversation that Service First was not seeking reimbursement, Kervin asked Hattaway to confirm that in writing. Hattaway responded by email that Bellissimo, Service First's President, instructed him to notify Kervin that Service First, Inc. would not be pursuing any lien/payment from Plumley. We note that Bellissimo was copied on this email to his Service First email address.

Based on the record presented at trial, we conclude that Kervin justifiably believed that Hattaway acted with corporate authority when he informed Kervin that Service First would not seek payment from Plumley. When attorneys deal with a corporate attorney in matters pertaining to the corporation, they should not have to seek additional affirmation of corporate authority when the corporate attorney holds himself out as acting on the instructions of the corporation.

Plumley met his burden of proving his affirmative defense that Service First had waived the debt he owed to Service First under the terms

of the agreement. Although the trial court found that Service First had not carried its burden of proof, the court also found that Service First had waived any amount that it had considered owed. This waiver is the basis of the denial of Service First's claim and was not clearly wrong.

We also reject Service First's assertion that the uncalled witness rule or adverse presumption was triggered when Plumley failed to call Hattaway as a witness. This presumption applies when a party has the power to produce witnesses who would elucidate the transaction or occurrence and fails to call those witnesses. *Bartley v. Fondren*, 43,779 (La. App. 2 Cir. 12/3/08), 999 So. 2d 146; *JPS Equipment, LLC v. Cooper*, 50,506 (La. App. 2 Cir. 2/24/16), 188 So. 3d 1106. The presumption is rebuttable, particularly when the witness is equally available to the opposing party. *Easter v. Direct Ins. Co.*, 42,178 (La. App. 2 Cir. 5/9/07), 957 So. 2d 323; *JPS Equipment, LLC*, *supra*.

We note that Hattaway was equally available to his former client, Service First. Plumley was obviously satisfied that he could establish remission of the debt at trial without Hattaway's testimony but through the email evidence and testimony of Kervin, Bellissimo, and Alford.

Finally, Service First maintains that Plumley made a misrepresentation within the meaning of La. C.C. art. 1953 each time following his settlement that he told Service First employees that he would repay the company. However, the evidence showed that Plumley notified Bellissimo's secretary of the settlement. This argument is without merit.

## CONCLUSION

At Service First's costs, the judgment is AFFIRMED.

13